[Crim. No. 15301. First Dist., Div. One. Nov. 28, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
HOWARD DUFFY WATSON, Defendant and Appellant.

## COUNSEL

Donavon R. Marble, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Clifford K. Thompson, Jr., and Charles R. B. Kirk, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RACANELLI, P. J.**—Defendant was convicted of second degree murder following a trial by jury and sentenced to state prison. He appeals, claiming error in the introduction of his confessions and admissions, failure of the prosecution to preserve available evidence for testing, in submitting an instruction on flight and other evidentiary rulings. We conclude after examination of the entire record that only one of these claims, the instruction on flight, has merit but was not prejudicial. For the reasons discussed herein, we affirm the judgment of conviction.

### Statement of Facts

At approximately 1:18 p.m. on Sunday, September 14, 1975, the body of a young woman, Nancy Huber, was discovered lying underneath a boxcar on a railroad siding in an industrial area of Berkeley. An officer who responded to the scene found the victim naked except for a pink sweater pulled up around her neck; her pants and panties were six feet away. Items of personal jewelry were strewn around the body. The ground adjacent to the body was covered with small rocks and sand;

there were scuff marks on the ground. Bloodstains were found beneath the victim's head.

The cause of death was traumatic asphyxia resulting from a combination of strangulation and a damaged larynx. There were numerous abrasions and contusions on the victim's face, head and neck indicating that she had been repeatedly struck before she died. Her skull was fractured on the right side of her face. There were bruises on one breast consistent with a blow from a clenched fist. The victim's genitalia had been horribly mutilated with a sharp instrument before she died. There was also a laceration in her groin area inflicted postmortem. Large tears radiated from the victim's anus consistent with a forceful entry of a large object. A number of curvilinear abrasions, appearing to be human bite marks, were found on the victim's body, around her lips, chin, the nipples of her breasts, and one in the pubic area probably inflicted after death. The autopsy examination revealed the victim's blood alcohol level was .26. The medical examiner was unable to determine whether sexual intercourse had occurred.

The victim's roommate, Janis S., testified that she and the victim had attended a party the night before in a warehouse near the siding where the body was discovered. The victim was still at the party when Janis left between 1 and 1:30 a.m.

Allen R., who attended the same party, testified he met the defendant there and talked to him several times during the evening. Defendant, who was dancing and enjoying himself, appeared to act normally and spoke coherently. The witness observed the victim and defendant (who was wearing distinctive clothing and a hat) leave the party together sometime after 2 a.m. Shortly afterwards the witness observed them sitting at a curb but paid no further attention to them. Janis reported the victim missing the following (Sunday) morning.

As a result of interviewing several persons who had attended the party, the investigating officers were able to develop a composite description of defendant. The following Monday afternoon the defendant was observed by Berkeley police officers standing on a street corner. In response to questioning, defendant falsely gave his name as Bernard DeLawrence stating he had just arrived from Oregon and had no identification or permanent address. One of the officers, Inspector Wolke, told defendant he matched the description of a suspect under investigation[1] and

[1]Inspector Wolke did not disclose either the nature of the crime or any of the facts concerning the investigation.

requested defendant to accompany them to the station. Upon defendant's refusal, he was immediately arrested and transported to the station. After being placed in a holding cell, defendant requested to speak to Inspector Wolke; when Wolke entered the cell, defendant grabbed him and demanded to know the nature of the investigation. Upon being informed it concerned an assault and rape of a woman, defendant stated that he hadn't killed any woman or raped her. Following a commotion by defendant, he was removed to a large interview room where Wolke advised defendant of his *Miranda* rights. Defendant stated he understood his rights and would talk to Wolke because he had nothing to hide. After identifying himself by his correct name, defendant gave a statement[2] recounting the circumstances of his arrival in Berkeley and of meeting the victim at the party.

Afterwards, defendant was permitted to use the restroom. Ignoring the officers' instruction, he shut and locked the door to the toilet stall, removed his undershorts and unsuccessfully attempted to dispose of them in the toilet; the undershorts were bloodstained. His clothing was then removed and a blanket provided; he was returned to the interview room where a pair of jail coveralls was furnished. The interrogation continued in the presence of other officers and a deputy district attorney. Defendant then gave two (taped) statements confessing the murder.[3]

Defendant testified in his defense that he was unable to recall any of the events after he arrived at the party because of his ingestion of large amounts of wine and drugs (LSD). His defense was supported by the testimony of two experts called by defendant.

---

[2]He stated he had arrived in Berkeley the preceding Friday morning from Oregon. He spent most of Saturday with friends, then hitched a ride to a youth hostel in an industrial area of Berkeley; the hostel was closed. Hearing music from a nearby warehouse, he went to the party where he drank some wine and danced with the victim whom he identified from a photograph shown to him. Later they went outside to a parking lot where they talked and drank wine until the victim left to return to the party to find her boyfriend. Thereafter, looking for a place to sleep, he kicked in the door to an office and slept through the night.

[3]Defendant made further incriminating statements during a break between these statements and later while being booked. During the former occasion, he summoned one of the officers (Meisner) and volunteered: "I did it. I killed her," amplifying that after they had engaged in consensual intercourse, he rendered the victim unconscious by a blow to the neck and then killed her. During the latter occasion, he told Wolke he didn't know why he had killed Nancy, probably because he wanted to see what it "felt like." He then described how he struck and bit the victim and "ripped" her body.

## The Confessions and Admissions

Defendant generally challenges the admissibility of his confessions and incriminating statements on several grounds. These claims may be catalogued as follows: (1) failure to advise him of his constitutional right to remain silent; (2) improper continuance of the interrogation after his request for an attorney; (3) inability to freely and voluntarily waive his constitutional rights as a result of impaired mental faculties, being under the influence of alcohol and drugs, and the coercive atmosphere that pervaded the interrogation process. Defendant also claims that the delay in arraigning him before a magistrate invalidates his confessions and admissions. Each of these claims is determined to be without merit; the statements were properly admitted.

### I.

The first of these claims is based upon the testimony of Inspector Wolke during an earlier pretrial hearing reflecting the omission of a specific advisement of the right to remain silent. (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; *People* v. *Dorado* (1965) 62 Cal.2d 338, 353 [42 Cal.Rptr. 169, 398 P.2d 361] [cert. den., 381 U.S. 937, 946 (14 L.Ed.2d 702, 710, 85 S.Ct. 1765, 1793)].) During a later examination by the trial judge, Inspector Wolke testified he did advise defendant of his right to remain silent. After hearing further testimony and listening to the recorded interrogations, the trial judge concluded that the initial omission was merely an oversight and that the right to silence admonition had been properly given before any questioning. In that connection the record reveals the following: "[The Court] . . . I've . . . observed all the witnesses involved, have heard the tapes played that are the matter of concern here in their entirety. . . . And I also have in mind the Defendant, the things he had to say and also his manner of expression, the tenor and timber [*sic*] of his voice and things of that type which were of interest and the comparison with those with what's on the tapes. And . . . it is my finding that he was advised of his rights by Inspector Wolke. I recognize there was some initial ambiguity in Inspector Wolke's testimony in that regard but I think looking at the rights the way he gave them and recited them on the other occasions, together with the entire observation of him as a witness and coupled also with the statements made by Mr. Watson himself when first questioned by Mr. Walthall [the deputy district attorney] I'm satisfied that he was given his rights on the initial occasion as well as on subsequent occasions. . . ."

It is settled that "[w]here . . . there is a conflict in the evidence, it is the duty of the reviewing court to determine if there is substantial evidence in the record to uphold the finding of the trial court, and the trial court's ruling will not be disturbed on appeal unless it is palpably erroneous." (*People* v. *Duren* (1973) 9 Cal.3d 218, 238 [107 Cal.Rptr. 157, 507 P.2d 1365]; see also *People* v. *Gilliam* (1974) 41 Cal.App.3d 181, 190 [116 Cal.Rptr. 317]; *People* v. *Brockman* (1969) 2 Cal.App.3d 1002, 1008 [83 Cal.Rptr. 70].) The record discloses ample evidence to support the trial court's determination that defendant was timely informed of his right to remain silent.

## II.

■ Defendant next claims, relying on *People* v. *Fioritto* (1968) 68 Cal.2d 714, 718-719 [68 Cal.Rptr. 817, 441 P.2d 625], that interrogation improperly continued after he had invoked his right to have an attorney present. However, as the People correctly note, defendant's failure to raise such specific objection below precludes consideration on appeal. (*People* v. *Peters* (1972) 23 Cal.App.3d 522 [101 Cal.Rptr. 403] [cert. den., 409 U.S. 1064 (34 L.Ed.2d 517, 93 S.Ct. 563)]; *People* v. *Deutschman* (1972) 23 Cal.App.3d 559, 565 [100 Cal.Rptr. 330].) Thus, where—as here—the defendant neglects to tender such issue by a timely objection during trial, ". . . the rule that the failure to object to *Miranda* error at the trial cannot be raised for the first time on appeal is equally applicable to *Fioritto* error." (*People* v. *Peters, supra,* at p. 532.) ■ Moreover, even if defendant had properly preserved the issue by appropriate trial objection, substantial evidence exists to support a factual finding (*People* v. *Turnage* (1975) 45 Cal.App.3d 201, 210 [119 Cal.Rptr. 237]) that defendant knowingly and intelligently waived the right (to counsel) of his own volition during preliminary questioning. At most, the record discloses[4] some ambiguity when defendant initially invoked his right and

[4]After being advised by the deputy district attorney of his *Miranda* rights, defendant first requested to be allowed to call a friend to retain an attorney, then stated he wished to talk to his psychiatrist. When the deputy indicated the interview was ended, defendant stated: "I'll talk to you. Sit down." After an unsuccessful effort to reach his friend by telephone, the deputy sought to clarify defendant's understanding of his rights and whether he desired to waive them. Defendant renewed his waiver, then recanted in reply to further inquiry; when the deputy restated his intention to terminate the interview since an attorney was not then available, defendant finally agreed to talk about the murder. *People* v. *White*, 275 Cal.App.2d 877 [80 Cal.Rptr. 461], cited by defendant, is factually distinguishable. In that case, the defendant was informed that a public defender would be unavailable until the following morning (some 15 hours later); the court held the waiver ineffectual and the statements inadmissible under the rationale of *People* v. *Ireland*, 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323] (the defendant's request to call his parents for his attorney, ignored by the officers, constituted a violation of his Fifth Amendment rights).

thereafter expressly waived such right indicating his willingness to answer questions.

The applicable case law is summarized in *People* v. *Turnage, supra,* 45 Cal.App.3d 201, where the court stated (at pp. 209-210): "It is, of course, well settled that in order to dispel the compulsion inherent in custodial surroundings and interrogation, the suspect must be properly warned . . . that he has the right to the presence of an attorney . . . . As a further protective device, the law provides that the interrogation must cease if the suspect indicates in any manner, at any time prior to or during questioning that he wishes to remain silent or that he wants an attorney. This duty to cease interrogating, however, commences only upon the suspect's initial indication that he wishes to exercise his Fifth Amendment privilege. If the suspect is willing to discuss the case fully with the police officers after having been taken into custody and advised of his rights, *Miranda* imposes no constitutional inhibition to continued questioning (*People* v. *Randall* (1970) 1 Cal.3d 948, 955 . . .). This is in accord with *People* v. *Fioritto* (1968) 68 Cal.2d 714, 719 . . . , where our Supreme Court held that 'we prohibit only continued questioning after an individual has *once* asserted his constitutional rights.' . . ." (Fns. omitted, and continuing at p. 211.) [¶] **(4)** ". . . *Miranda* only prohibits further *interrogation* if the suspect in fact requests an attorney, but leaves unaffected the right of the police to clarify whether the suspect understood his constitutional rights or intended to waive them. Accordingly, the case law draws a sensible distinction between clarification and interrogation. On the one hand, it *permits clarifying questions* with regard to the individual's comprehension of his constitutional rights or the waiver of them; on the other hand, it *prohibits substantive questions* which portend to develop the facts under investigation (*People* v. *Smith,* [270 Cal.App.2d 715 (76 Cal.Rptr. 53)] *supra,* at p. 722; *United States* v. *Nielsen* (7th Cir. 1968) 392 F.2d 849, 852-853)."

### III.

■ The thrust of defendant's arguments, that his confessions were involuntary in that he was incapable of free and rational choice, centers upon claims of physical and mental inability to intelligently, knowingly and freely waive his constitutional rights prior to a process of interrogation allegedly conducted under coercive circumstances. We analyze each contention separately in light of settled principles governing the voluntariness of confessions.

■ "A confession is involuntary unless it is 'the product of a rational intellect and a free will.' [Citations.] It is not the product of a rational intellect and a free will if the petitioner's will to resist confessing is overborne. [Citations.] An accused's will can be overborne by pressures engendered by physical or psychological coercion on the part of law enforcement officers [citations], or by the influence of a drug [citation] or insanity [citation] that impairs his ability to exercise his rational intellect and free will. If an accused's will is overborne because of impairment of his ability to exercise his rational intellect and free will, it is immaterial whether that impairment was caused by the police, third persons, the accused himself, or circumstances beyond anyone's control. [Citation.] . . . The only issue is whether the accused's abilities to reason or comprehend or resist were in fact so disabled that he was incapable of free or rational choice. [Citation.] To determine this issue, the 'totality of circumstances' [citations] surrounding the interrogation must be considered." (*In re Cameron* (1968) 68 Cal.2d 487, 498 [67 Cal.Rptr. 529, 439 P.2d 633].) ■ "The use in a criminal prosecution of involuntary confessions constitutes a denial of due process of law under both the federal and state Constitutions. [Citations.]" (*People* v. *Haydel* (1974) 12 Cal.3d 190, 197 [115 Cal.Rptr. 394, 524 P.2d 866].)

■ Accordingly, it becomes our duty "to examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was properly found. [Citations.] In determining whether the defendant's confession is the product of a rational intellect and a free will, the totality of the circumstances surrounding the confession must be considered. [Citation.] Where the evidence is conflicting, an appellate court will accept the trial court's finding if the evidence relied on by the trial court 'is not so improbable as to be entirely unworthy of belief.' [Citation.]" (*People* v. *Hutchings* (1973) 31 Cal.App.3d 16, 20 [106 Cal.Rptr. 905]) and its determination is not "palpably erroneous." (*People* v. *Brockman, supra,* 2 Cal.App.3d 1002, 1008.)

■ Initially we note that at the time of the *voir dire* hearing concerning voluntariness, no evidence was introduced bearing upon his asserted subnormal level of intelligence or psychiatric infirmity. Defendant's argument is apparently based upon clinical and psychiatric evidence presented for the first time during defendant's case in chief. The evidence consisted of expert testimony that defendant had an I.Q. of 65, exhibited signs of chronic organic brain damage and schizophrenia which impaired his judgment and memory and rendered him incapable of being aware of what he was doing on September 14, 1975; that

ingestion of LSD or alcohol would have accentuated his incapacity. On rebuttal, the prosecution presented the testimony of Dr. Morris, a psychiatrist who examined defendant on September 15 and 16, 1975. Dr. Morris diagnosed defendant as having sexual deviant interests and suffering from drug abuse with schizoid features. He found no mental disease or defect that would have prevented an understanding of the nature and consequence of his actions. It was Dr. Morris' opinion that at the time of his examinations defendant appeared rational and was not under the influence of either LSD or alcohol.

■ A schizophrenic condition does not render a defendant incapable of effectively waiving his rights. (*In re Walker,* 10 Cal.3d 764, 779-780 [112 Cal.Rptr. 177, 518 P.2d 1129].) Nor does the presence of evidence of subnormality require the automatic exclusion of a confession. (*People* v. *Lara,* 67 Cal.2d 365, 385 [62 Cal.Rptr. 586, 432 P.2d 202] [cert. den., 392 U.S. 945 (20 L.Ed.2d 1407, 88 S.Ct. 2303)] [I.Q. between 65 and 71]; accord: *People* v. *Isby,* 30 Cal.2d 879, 897-898 [186 P.2d 405] [I.Q. of 58].) And contrary to defendant's argument, neither the consumption of alcohol nor ingestion of drugs alone compels the conclusion that a defendant is incapable of intelligently waiving his rights. (*People* v. *Bauer* (1969) 1 Cal.3d 368, 374 [82 Cal.Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398] [cert. den., 400 U.S. 927 (27 L.Ed.2d 187, 91 S.Ct. 158)] [narcotics]; *People* v. *Barrow* (1976) 60 Cal.App.3d 984, 991 [131 Cal.Rptr. 913] [alcohol]; *People* v. *Conrad* (1973) 31 Cal.App.3d 308, 319-321 [107 Cal.Rptr. 421] [alcohol and drugs]; *People* v. *Moore* (1971) 20 Cal.App.3d 444, 449-450 [97 Cal.Rptr. 601] [alcohol]; *People* v. *Stroud* (1969) 273 Cal.App.2d 670, 679-680 [78 Cal.Rptr. 270] [alcohol]; *People* v. *Houle* (1970) 13 Cal.App.3d 892, 896 [91 Cal.Rptr. 874] [drugs].)

■ A review of the evidence, though conflicting, supports the trial court's determination of a knowing, intelligent and competent waiver of rights by the defendant. In reviewing the "totality of circumstances" (*In re Cameron, supra,* 68 Cal.2d 487, 498) surrounding the interrogation, we cannot conclude that such determination was palpably erroneous. (*People* v. *Brockman, supra,* 2 Cal.App.3d 1002, 1008.)

■ Relying on *People* v. *Haydel, supra,* 12 Cal.3d 190, defendant also contends that the interrogation process was conducted under coercive circumstances rendering the confessions invalid. The contention, hinged upon a claim of being deprived of food and clothing, is groundless. The evidence reveals that defendant asserted he was unable to eat food while "tripping" on LSD. Following his abortive attempt to

dispose of his blood-stained undershorts, his outer clothing was removed as a precautionary measure, and he sat in the interview room wrapped in a blanket for a short time while coveralls were obtained. (Cf. *People* v. *Haydel, supra,* at pp. 199-201 [where the defendant's written consent to search and incriminating statements were given in "an atmosphere of substantial coercion" resulting from the security officers' improper detention of his wife and child, his repeated concern for their release and concomitant pressure upon him to cooperate (by first signing the statements) in the hope they would then be released].) There is nothing in the record to support defendant's assertion that his free will was overborne by either physical or psychological coercion on the part of the officers during the interrogation process. (*In re Cameron, supra,* 68 Cal.2d 487, 498.)

Lastly, defendant claims the confessions are invalid by reason of an alleged failure to comply with Penal Code section 825.[5] This issue was not raised in the trial court and thus is not properly before us. (*People* v. *Moore* (1970) 13 Cal.App.3d 424, 436-437 [91 Cal.Rptr. 538] [cert. den., 404 U.S. 880 (30 L.Ed.2d 161, 92 S.Ct. 214)].) ▬ Moreover, even if we were to conclude that the delay in arraigning defendant was unreasonable (which we expressly do not determine), such delay does not by itself render inadmissible any confession obtained during such period of delay (*People* v. *Lee* (1970) 3 Cal.App.3d 514, 522 [83 Cal.Rptr. 715]), and does not require reversal unless defendant shows that by reason of such delay " 'he was deprived of a fair trial or otherwise suffered prejudice . . .' " (*People* v. *Powell,* 67 Cal.2d 32, 60 [59 Cal.Rptr. 817, 429 P.2d 137]); defendant has failed to make such necessary showing.

*Failure to Preserve Evidence
and Inadequate Testing*

Defendant claims a denial of due process and fair trial by reason of the prosecution's failure to preserve favorable evidence and in the inadequate testing of blood and soil samples.

---

[5] That section, in relevant part, provides: "The defendant must . . . be taken before the magistrate without unnecessary delay, and, in any event, within two days after his arrest, . . ."

Defendant was arrested at approximately 3 p.m. on September 15, 1975. The records of the Berkeley-Albany Municipal Court, which we judicially notice (Evid. Code, § 452, subd. (d)(1)), indicate defendant was arraigned at 2 p.m. on September 17, 1975.

## I.

**█** Defendant contends the failure to obtain his blood specimen following his arrest, in order to conduct tests for alcohol and drug content, deprived him of evidence relevant to the issue of voluntariness of his confessions and his defense of diminished capacity.

Law enforcement agencies are not required to take a blood sample from a defendant on their own initiative in order to determine whether he is under the influence of alcohol or drugs. (*In re Martin* (1962) 58 Cal.2d 509, 512 [24 Cal.Rptr. 833, 374 P.2d 801]; *In re Koehne* (1960) 54 Cal.2d 757, 759 [8 Cal.Rptr. 435, 356 P.2d 179]; *People* v. *Jenkins* (1974) 40 Cal.App.3d 1054, 1056-1057 [115 Cal.Rptr. 622]; *In re Newbern* (1959) 175 Cal.App.2d 862, 866 [1 Cal.Rptr. 80, 78 A.L.R.2d 901].) "... Rather it is the accused who must act to protect his interests, and it is only when he is denied an opportunity, reasonable under the circumstances, to procure a timely sample of his blood that he can properly claim a denial of due process. [Citation.]" (*In re Koehne, supra,* at p. 759.) Defendant neither requested a blood test nor informed the officers that he had recently ingested LSD. Nor did the officers believe defendant was under the influence of alcohol or drugs while being questioned.[6]

## II.

**█** Defendant further complains that the tests performed on the bloodstains (found on his undershorts and trousers) were inadequate and that additional comparison tests of soil samples should have been undertaken by the prosecution. The evidence disclosed that the victim's blood type matched that of the blood stains (defendant's blood type was dissimilar). He complains that the failure to conduct "blood-grouping" tests and additional tests to determine whether the blood stains were

[6]The physician who first saw defendant after his arrest, detecting an odor of alcohol, decided to postpone his examination until the next day because he was uncertain if defendant's boisterous conduct was the result of intoxication. Upon examining defendant, he concluded that any alcohol he may have consumed had no effect on his ability to understand and communicate; he also testified that defendant did not appear to be under the influence of LSD. We note that the arrest of defendant occurred more than 24 hours after the murder; evidence of his then condition of sobriety could have little bearing on his condition at the time of the act: "It is a matter of common knowledge that the intoxicating effect of alcohol diminishes with the passage of time; hence, the probative value of a blood test diminishes as well." (*In re Martin, supra,* 58 Cal.2d 509, 512.)

venous or menstrual, deprived him of evidence that could have been proven exculpatory.[7] These complaints are similarly without merit.

Defense counsel's request (on Oct. 30, 1975) that "blood-typing" tests be undertaken was complied with. The requested test for "menstrual blood indication" was performed by microscopic analysis shortly before trial and indicated the stains to be venous in origin. The criminalist testified that where the stains were over a week in age, of the two recognized test procedures only the microscopic test would yield reliable results. It is evident that the failure to perform other testing was due to the nature of the substance and not any conduct on the part of the prosecution. (See *In re Martin, supra,* 58 Cal.2d 509, 512.)

The prosecution unsuccessfully attempted to examine soil particles embedded in defendant's trousers. Defendant's companion claim that his boots and other garments should have been likewise tested is unpersuasive in view of the criminalist's testimony that nothing was found on them to connect defendant to the scene of the crime. Contrary to defendant's assertion, the present case does not involve the suppression of evidence by the police. (Cf. *People* v. *Ruthford* (1975) 14 Cal.3d 399 [121 Cal.Rptr. 261, 534 P.2d 1341], and *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361], readily distinguishable on their facts.) The prosecution is not required to engage in foresight and gather up everything which might eventually prove useful to the defense. (*People* v. *Miller* (1975) 52 Cal.App.3d 666, 670 [125 Cal.Rptr. 341].) Indeed, with defendant's confessions fresh in their ears, the officers had no reason to start looking for evidence conflicting with his admitted guilt. (See *People* v. *Wright* (1968) 258 Cal.App.2d 762, 768 [66 Cal.Rptr. 95].) We conclude there was no denial of due process or a fair trial.

### Admission of Evidence of "Bite Marks"

Dr. Beckstead, a specialist in prosthetic dentistry and teacher of forensic odontology (the study of dental evidence to identify persons by their teeth and bite marks), testified that the dental impressions taken of defendant's teeth were consistent with the bite marks found on the

[7]Defendant theorizes, in substance, that "blood-grouping" tests would have produced a more reliable finding than "blood types." He characterizes the omission to conduct a full range of menstrual blood and blood-group testing as suggestive of an "inference of suppression"; such conjecture is totally unfounded. Moreover, it is difficult to understand how the claimed failure to perform other menstrual blood testing could have been favorable to the defense in view of defendant's testimony he could not recall engaging in sexual intercourse with a woman during her menstrual period.

victim's face, breast and in the pubic region. He illustrated his testimony through the use of color slides and an articulating model of defendant's teeth impressions which he compared to the molded impressions taken of the bite marks on the body. In order to graphically demonstrate the matching of the impressions, he displayed a video tape of the model biting into the various molded impressions. Defendant's sole objection at trial was that the video tape was redundant; the trial court determined that the film was useful to illustrate the testimony and was not unduly prejudicial.

■ In his brief, defendant for the first time appears to question the sufficiency of the foundation for such testimony and complains that the color slides of the body admitted in evidence were highly inflammatory and prejudicial. It is well established that in order to raise an issue of erroneous admission of evidence on appeal, the party "must *object* at the trial, *specifically* stating the grounds of his objection, and directing the objection to the *particular evidence* which he seeks to exclude. . . . [and] failure to object at all waives the defect." (Witkin, Cal. Evidence (2d ed. 1966) § 1285, p. 1188, and cases there collected.) Nonetheless, we elect to discuss these belated claims.

The principles governing admission of "bite mark" evidence have been authoritatively stated in *People* v. *Marx* (1975) 54 Cal.App.3d 100, 106-112 [126 Cal.Rptr. 350, 77 A.L.R.3d 1108]. As *Marx* indicates, while bite marks identification has not reached a level of scientific development comparable to well-recognized techniques of identification through dentition, such evidence is nevertheless admissible when based upon "scientifically and professionally established techniques—X-rays, models, . . . photography—to the solution of the particular problem which, though novel, was well within the capability of those techniques." (*Id.* at p. 111.) ■ Once such a new scientific technique has been approved in a published decision on appeal, the precedent so established is controlling in the absence of evidence reflecting change in the attitude of the scientific community. (*People* v. *Kelly,* 17 Cal.3d 24, 32 [130 Cal.Rptr. 144, 549 P.2d 1240].)

In addition to testifying to a number of experiments attempting to duplicate the bite marks, Dr. Beckstead stated his opinion that "The possibilities of having another individual with exactly the same separations that Mr. Watson has, with the teeth on the same angle, with the same width of teeth, the teeth in the same position in the skull, exerted

the way they were with the same opening and closing thrust is highly unlikely."

The trial court's finding of a sufficient foundation based upon such evidence was manifestly sound and may not be disturbed on appeal. (*People* v. *Kelly, supra,* 17 Cal.3d 24, 39.)

■ The color slides[8] objected to by defendant were determined to be of probative value and not unduly prejudicial. (Evid. Code, § 352.) "The fact that gruesome photos may prejudice a defendant in the eyes of a jury does not, alone, render them inadmissible. . . .

" . . . . . . . . . . . . . . . . . .

"The question, therefore, is whether the photos have probative value and are offered and admitted for that purpose, or whether their primary purpose is to inflame the jury against the defendant. The question is one for the trial court, and, in the absence of a clear abuse of that court's discretion, the admission of such evidence will not be disturbed on appeal." (*People* v. *Seastone* (1969) 3 Cal.App.3d 60, 64-65 [82 Cal.Rptr. 907].) Our independent examination of such evidence reveals no abuse of discretion by the trial court.

### The Flight Instruction

■ The trial court *sua sponte* gave the standard approved jury instruction on flight,[9] adding the following language: "Whether or not the conduct of a person constitutes flight is also a question which it is up to the jury to decide." (See *People* v. *Caldera* (1959) 173 Cal.App.2d 98, 101 [342 P.2d 945].)

---

[8]Several of these slides, found to be cumulative and prejudicial, were ruled inadmissible.

[9]CALJIC No. 2.52, read to the jury, provides as follows: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

At the time the trial court gave the above instruction to the jury it added the words "if any" after the word "weight" in the last sentence.

Defendant contends that in the absence of evidence of flight, the submission of such instruction constitutes error. The contention has merit.

Penal Code section 1127c mandates an instruction on flight "where evidence of a defendant's flight is relied upon as tending to show guilt." (*People* v. *Cannady* (1972) 8 Cal.3d 379, 391 [105 Cal.Rptr. 129, 503 P.2d 585].) Flight becomes relevant because it may demonstrate consciousness of guilt and has no other probative value. (*People* v. *Hill* (1967) 67 Cal.2d 105, 120 [60 Cal.Rptr. 234, 429 P.2d 586].) But the mere fact of defendant's arrest nearly two days later and miles away from the crime scene—standing alone—is not evidence of flight that may support an inference of guilt. Under the circumstantial-evidence-reasoning process (see *People* v. *James,* 56 Cal.App.3d 876, 890 [128 Cal.Rptr. 733]; Jefferson, Cal. Evidence Benchbook, §§ 19.1-19.3, pp. 215-222), it is clear that such evidence, without more, cannot logically tend to support an inference of guilt. It was error to give such instruction.

However, we conclude that the error was not prejudicial. As noted, the court instructed the jury that whether defendant's conduct constituted flight was a question for it to determine; accordingly, the instruction could not have mislead the jury. In light of the overwhelming evidence of guilt, we find such error to be harmless. (*People* v. *Watson* (1956) 46 Cal.2d 818, 838 [299 P.2d 243]; *People* v. *Ornelas* (1936) 17 Cal.App.2d 608, 610-611 [62 P.2d 608].)

The judgment is affirmed.

Elkington, J., and Weinberger, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 22, 1978.

---

*Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.