Filed 1/12/15  P. v. Solis CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B252017 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA075226) |
| v. | |
| RANDALL SOLIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, David B. Gelfound, Judge.  Affirmed as modified.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Rama R. Maline, Deputy Attorney General, for Plaintiff and Respondent.

INTRODUCTION

Defendant and appellant Randall Solis (defendant) was convicted of second degree murder (Pen. Code, § 187, subd. (a)[1]).  On appeal, defendant contends that the trial court erred in instructing the jury pursuant to CALCRIM No. 372, and the abstract of judgment should be amended to reflect defendant was found guilty of second degree murder.  We order that the abstract of judgment be amended to provide that defendant was found guilty of second degree murder, and we otherwise affirm the judgment.

**BACKGROUND**

### A.     Factual Background

#### 1.     Prosecution Evidence

On November 11, 2012, defendant was sitting in his car that was parked in an alley next to the garage of his friend, Jorge Ayala, using Ayala's "wifi" service to access the internet on his laptop computer.  At about 10:00 p.m., Saul Olivares and his friend, John Villalta, were in the alley near a dumpster.

Defendant drove southbound in the alley from behind Olivares and Villalta and pointed a gun at them.  Olivares said "what the fuck?" and after a few seconds defendant drove way.  A video tape was played for the jury depicting defendant driving slowly down the alley with Villalta far behind defendant's car, making gestures.  Defendant's car reentered the alleyway, going northbound, and drove slowly past Villalta and two other men.  Villalta walked toward the front of a nearby apartment building, and when he returned, he was holding something in his hands.

At about this time, Blas Cuellar and Luis Sandoval were sitting in Sandoval's father's truck, parked in a carport near the alley.  They heard gunshots, and about five minutes later, Villalta approached Cuellar and Sandoval and said that there was a car

---

[1]     All statutory citations are to the Penal Code unless otherwise noted.

"going around," the occupant in the car had a rifle and a pistol, and the occupant shot at him. Concerned that Villalta could have been killed, Sandoval told him to go home. Villalta responded "fuck that."

Villalta approached defendant's car. Olivares testified that he saw defendant shoot Villalta five times from inside defendant's car, and as Villalta was being shot he, Villalta, threw a baseball bat at defendant's car.

After Villalta was shot, he ran toward Cuellar and Sandoval, but fell to the ground before he made it to them. Defendant drove away "very fast." Sandoval went to Villalta, asked where he had been shot, and gave him "mouth to mouth, but blood started coming out . . . ." Cuellar said "he's gone" and Cuellar called 911. The incident scene was about three blocks from the San Fernando Police Department station.

Ayala was at home and heard five or six gunshots. He eventually went outside his house and was told by "one of the witnesses" that "[the shooter was] your friend in the white car with the stickers." Ayala immediately thought it was defendant, whom Ayala called "Randy."

After Olivares saw defendant "do a drive-by" shooting, Olivares retrieved his gun, entered his car, and attempted to follow defendant. Olivares saw defendant's car traveling on Third Street, turned in front of defendant's vehicle, pulled over and allowed defendant to pass him, and continued to follow defendant. Olivares ultimately was unable to catch up to defendant. Olivares drove home and called 911.

San Fernando Police Department Lieutenant Robert Jacobs testified that there were three 911 telephone calls reporting the shooting, and none of them was made by defendant or anyone claiming to be the shooter. San Fernando Police Department Sergeant Saul Garibay responded to the scene of the shooting; Officer Bayardo was already there. A man told Sergeant Garibay that his friend had been shot. Officer Bayardo checked Villalta's vital signs, but Villalta appeared to be deceased. Sergeant Garibay knew Villalta as an associate of the San Fer gang, and Olivares testified that he had been a member of that gang since he was four years old.

3

Ayala told the police that the shooter might be "Randy." Los Angeles County Sheriff's Lieutenant Shaun McCarthy asked Ayala to contact defendant and tell him to contact the Los Angeles County Sheriff's Department. Ayala went to the house of defendant's mother; defendant was there, and Ayala spoke to him. Ayala thereafter called Lieutenant McCarthy and said that defendant was claiming that the shooting was self-defense. Lieutenant McCarthy encouraged Ayala to have defendant contact Lieutenant McCarthy.

On November 13, 2012, defendant contacted Lieutenant McCarthy and they met at Hanson Dam Park in Lake View Terrace. Defendant arrived in the same car that he used on the day of the shooting, and he had two guns with him in his car, including a Marlin Model 795, .22-caliber, semiautomatic long rifle. Defendant "indicated" to Lieutenant McCarthy that he used the semiautomatic rifle in the shootings. At some point during the interview, Lieutenant McCarthy's partner retrieved the .22 caliber rifle used in the shootings and another gun from the rear of defendant's car. The audio recording of the interview with defendant was played for the jury.

During the interview, defendant said that he parked his car next to the garage of his friend Ayala and was using his "wifi" to access the Internet, as he had done before. Three people, whom defendant did not know at the time were gang members, gathered at the rear of defendant's car.[2] Defendant asked the men what they were doing, and said, "You're not—you're not gonna messing with my car." Defendant also said, "Don't mess with my car, I'm armed." The leader of the group responded, "Well, I got a gun too." When defendant tried to drive off, someone threw a bottle at his car. Defendant exited his car, and said "what the hell happened?" The men attacked defendant.

Defendant re-entered his car and drove around the block, and returned to the alley to see where the men were and to see what they were up to. Defendant had in the car a Marlin .22-caliber long rifle that he said was registered in his name. The men chased and tried to attack defendant. A man with a bat ran toward defendant's car and threw the bat

---

[2] Also during the interview, defendant said that the individuals were gang members.

4

at defendant's car. Defendant said he had "no choice" but to fire his gun, and he thought he was going to be hit in the head or killed. Defendant shot the man three or four times, and drove away. Defendant told the detectives, "What am I gonna do, stop?"

Robert Keil, a Senior Criminalist for the Los Angeles County Sheriff's Department, examined and test fired the Marlin Model 795, .22-caliber, semiautomatic long rifle. Criminalist Keil concluded that the six casings recovered at the scene of the crime were fired from that rifle.

Dr. Vladimir Leveicky, a deputy medical examiner with the Los Angeles County Department of Corner, performed the autopsy of Villalta. Dr. Leveicky determined that Villalta sustained five gunshot wounds, and Dr. Leveicky removed five projectiles from Villalta's body. Dr. Leveicky opined that the cause of Villalta's death was the gunshot wounds he received.

### 2. *Defendant's Evidence*

Defendant did not testify or present any evidence in his defense.

### B. **Procedural Background**

The District Attorney of Los Angeles County filed an information charging defendant with willful, deliberate, and premeditated murder in violation of section 187, subdivision (a). The District Attorney alleged that defendant personally used a firearm within the meaning of section 12022.53, subdivision (b); personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c); personally and intentionally discharged a firearm which proximately caused great bodily injury or death within the meaning of section 12022.53, subdivision (d); and inflicted great bodily injury and death as a result of discharging a firearm from a motor vehicle within the meaning of section 12022.55

Following trial, the jury acquitted defendant of first degree murder; found defendant guilty of second degree murder; and found the section 12022.53, subdivisions (b) and (d), allegations true. The trial court sentenced defendant to state prison for a term

of 40 years to life, consisting of a term of 15 years to life for second degree murder, and a consecutive 25 years to life on the firearm enhancement in violation of section 12022.53, subdivision (d). The trial court imposed and stayed sentence on the firearm enhancement prescribed by section 12022.53, subdivision (b).

The trial court awarded defendant custody credit, and ordered him to pay various fees, fines and penalties. Defendant filed a timely notice of appeal.

## DISCUSSION

### A. CALCRIM No. 372

Defendant contends that the trial court erred in instructing the jury pursuant to CALCRIM No. 372. We disagree.

#### 1. *Applicable Law*

"Penal Code section 1127c requires that whenever evidence of flight is relied on to show guilt, the court must instruct the jury that while flight is not sufficient to establish guilt, it is a fact which, if proved, the jury may consider." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1243.) An instruction on flight is appropriate if there is substantial evidence the defendant departed the crime scene under circumstances suggesting the movement was motivated by a consciousness of guilt. (*People v. Howard* (2008) 42 Cal.4th 1000, 1020.) "Flight requires '"a purpose to avoid being observed or arrested."' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 710.)

#### 2. *Background Facts*

The prosecutor argued that there was sufficient evidence for giving the flight instruction in CALCRIM No. 372, stating that there was evidence that defendant shot the victim and left, did not contact police, did not call 911, and did not tell anyone what happened. Defendant's counsel responded, "That's a bit tricky. There's obviously, other people in the area that could have done something for him, so his flight might also had to

6

for his own safety. I don't think [instructing the jury on CALCRIM No. 372] is appropriate." The trial court overruled defendant's objection stating that there was sufficient evidence to give the instruction. The trial court stated also that defendant's counsel can make his argument "in front of the jury."

The trial court instructed the jury with CALCRIM No. 372, stating, "If the defendant fled or tried to flee immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

### 3. Analysis

The trial court properly instructed the jury with CALCRIM No. 372, the flight instruction, because the evidence permits a reasonable inference that defendant departed the crime scene with a consciousness of guilt. "To obtain the instruction, the prosecution need not prove the defendant . . . departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence. [Citation.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.) "Alternative explanations for flight conduct go to the weight of the evidence, which is a matter for the jury, not the court, to decide. [Citations.]" (*People v. Rhodes* (1989) 209 Cal.App.3d 1471, 1477.) The evidence of flight need not be uncontradicted. (*People v. Richardson* (2008) 43 Cal.4th 959, 1020.)

There was evidence that after defendant shot Villalta, he drove away "very fast." Defendant did not go to the San Fernando Police Department station to report the incident despite it being only about three blocks from the incident scene, and did not call 911 to report the incident. Defendant reported the incident to the police about two days after it occurred, and only after Lieutenant McCarthy encouraged Ayala to have defendant contact the police.

Defendant relies on *People v. Crandell* (1988) 46 Cal.3d 833, disapproved on another ground in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365, and *People v.*

7

*Watson* (1977) 75 Cal.App.3d 384, in support of his contention that the trial court erred in instructing the jury with CALCRIM No. 372. Those cases, however, are distinguishable.

In *People v. Crandell*, *supra*, 46 Cal.3d 833, the defendant was charged with two murders. (*Id*. at pp. 847-848.) At trial, the uncontradicted evidence established that the defendant left the crime scene to accomplish specific tasks, intended to return to dispose of the bodies, and was arrested as he drove back to the scene of the crime. (*Id*. at pp. 869-870.) The court concluded that a flight instruction had been given improperly because there was no evidence on which the jury reasonably could infer that the defendant left the crime scene to avoid being observed or arrested. (*Id*. at p. 869.)

In *People v. Watson*, *supra*, 75 Cal.App.3d 384, there was no evidence that the defendant left the scene immediately upon completion of his crime. The victim was murdered, and there were no witnesses to the defendant's activities after the murder. As the court explained, the mere fact of the defendant's arrest nearly two days later and miles away from the crime scene is not evidence of flight. (*Id*. at p. 403.)

Here, as noted above, there is evidence on which the jury reasonably could infer that defendant fled the crime scene to avoid being observed or arrested. The circumstances of defendant's departure from the crime scene could logically permit an inference that his movement was motivated by guilt. Instructing the jury on CALCRIM No. 372 was proper.

Defendant also contends that CALCRIM No. 372 impermissibly lessens the prosecutor's burden of proof. We disagree.

CALCRIM No. 372 states that defendant's fleeing "may" show that he was aware of his guilt, and directs the jury that, "If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct." It further directs the jury that it cannot find the defendant guilty solely because he fled or attempted to flee.

The instruction leaves it to the jury to decide whether flight occurred, what weight to give the evidence, and whether there was an alternative explanation for the defendant's departure. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055; *People v. Lucas* (1995) 12

8

Cal.4th 415, 471.) In *People v. Mendoza* (2000) 24 Cal.4th 130, our Supreme Court held: "As the United States Supreme Court has observed: 'A permissive inference does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved. . . . A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury. (*Ulster County Court* [*v. Allen*] [(1979)] 442 U.S. [140,] 157-163.)' [Citations.] This test permits a jury to infer, if it so chooses, that the flight of a defendant immediately after the commission of a crime indicates a consciousness of guilt. Thus, here the flight instruction does not violate due process." (*Id.* at p. 180; *People v. Abilez* (2007) 41 Cal.4th 472, 522 [flight instruction "'merely permitted the jury to consider evidence of flight in deciding defendant's guilt or innocence; it did not suggest that the jury should consider such evidence as dispositive'"]; *People v. Navarette* (2003) 30 Cal.4th 458, 502 [defense counsel's argument that the jurors should be instructed that defendant may have fled for a reason other than his guilt in the present crime "turns the [flight] instruction on its head"]; *People v. Crandell*, *supra*, 46 Cal.3d 833, 870 [the existence and significance of flight is an issue left to the jury's determination].) CALCRIM No. 372 did not lower the prosecution's burden of proof.

### B. Correction of Abstract of Judgment

Defendant contends, and the Attorney General does not disagree, that the abstract of judgment must be amended because it incorrectly states that the jury found defendant guilty of first degree murder. We agree.

The abstract of judgment states that defendant was found guilty of first degree murder. This is incorrect. The jury acquitted defendant of first degree murder, and found him guilty of second degree murder. Appellate courts may order abstracts of judgment corrected. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-187; *People v. Wynn* (2010) 184 Cal.App.4th 1210, 1221; *People v. Zackery* (2007) 147 Cal.App.4th 380, 385.)

9

Accordingly, the abstract of judgment should be corrected to reflect that defendant was found guilty of second degree murder, not first degree murder.

## DISPOSITION

We order that the abstract of judgment be amended to state that defendant was found guilty of second degree murder.  The trial court shall forward to the Department of Corrections and Rehabilitation the amended abstract of judgment.  In all other respects the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, J.


We concur:


TURNER, P. J.


KRIEGLER, J.


10