**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Verdia MILLER, Defendant-Appellant.**

No. 13368.

Missouri Court of Appeals,
Southern District,
Division Two.

July 1, 1986.

Motion for Rehearing or Transfer
Denied July 21, 1986.

Application to Transfer Denied
Sept. 16, 1986.

T. Patrick Deaton, Public Defender, James D. McNabb, Asst. Public Defender, Springfield, for defendant-appellant.

John Ashcroft, Atty. Gen., Thomas Carter, II, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

HOGAN, Presiding Judge.

A jury has found defendant Verdia Miller guilty of capital murder as defined by § 565.001, RSMo 1978, now repealed. Her punishment was assessed at imprisonment for and during the term of her natural life, as authorized by former § 565.008.1. The defendant appeals.

On October 20, 1978, one Larry Dean Smiddy was shot to death in Newton County. Shortly before he was killed, Smiddy had gone to the defendant's residence in the company of two other men, Edward "Shyster" Jackson and Bobby Joe Mingo. The defendant was well acquainted with Jackson and Mingo. It was fairly inferable that Jackson and Mingo were drug addicts, in street parlance "users" or "junkies."

The victim, Jackson and Mingo went to the defendant's residence about 4 a.m. to "mainline" some cocaine which the victim had in his possession. Mingo testified that Smiddy had a considerable quantity of cocaine on his person; it was in a "little box" and there were "little vials, eight to nine of them." While the "firing" (intravenous injection) of cocaine was being prepared, Jackson suggested to Mingo that he, Jackson, intended to kill the victim to obtain a supply of cocaine. Mingo refused to assist Jackson.

Jackson and the defendant then contrived a plan to do away with the victim and obtain the cocaine. Jackson asked the defendant for her handgun and for a pair of gloves. She furnished both. The two decided that when the victim, Mingo and Jackson left the defendant's premises, she would ask to go along. At some point defendant would ask the driver to stop the car so she could relieve herself. At that time, Jackson would kill Smiddy. Jackson and the defendant also prepared for other contingencies. Defendant gave Jackson a pair of rubber gloves; she also put on two sets of clothes. If she got blood on the first set of gloves and clothes, she could

remove and discard them. Defendant also took along a white cloth to be used to clean up any blood and to obliterate fingerprints.

When Smiddy, Jackson and Mingo decided to leave the defendant's residence, defendant got in Smiddy's automobile. Mingo was taken to his apartment. Defendant, Jackson and their victim then drove to an area south of Joplin known as "the Falls area" in the victim's automobile. Defendant asked the victim to stop so she could relieve herself. While the defendant was out of the car, but nearby, she saw Jackson shoot Smiddy in the head. Jackson shot Smiddy four times in the head. There was positive testimony from a pathologist that the four "gunshot wounds," as he described them, were the direct cause of Smiddy's death.

Defendant and Jackson then pulled their victim's body from the automobile and left it in a ditch alongside the road. Jackson and the defendant appropriated their victim's personal effects, including his watch. Jackson "got rid" of the victim's car, which had been "wiped down" to remove blood and fingerprints.

A Newton County deputy sheriff discovered Smiddy's corpse lying in the ditch where it had been left. This officer testified that Smiddy's body "was up against a fence row, up in the brush." This officer also found a white piece of cloth, a woman's white glove and a rubber glove, all bloodstained, at the same place.

The investigation of this cause took some time; Smiddy was killed in late 1978, and a formal accusation was not filed until 1981. In the spring of 1981, Jackson was charged with the crime. Defendant Miller testified at Jackson's preliminary hearing as a witness for the State. Jackson thereafter pled guilty. At all times prior to January 1982, the defendant maintained she either had not participated in Smiddy's murder, or that Jackson had forced her to participate. On January 14, 1982, the defendant sought asylum in the Jasper County jail because some threats had been made against her life. She was accommodated. On January 15, 17 and 18 defendant admitted she had participated in the murder of Larry Dean Smiddy. This appeal is focussed on the admissibility of those incriminating statements.

In this court, counsel for defendant has briefed five assignments of error. The first two assignments of error are focussed on the admissibility of defendant's inculpatory statements made after she asked to be placed in protective custody. They overlap, but will be considered separately to the extent possible. As a threshold observation, we note that prior to trial, defendant moved to suppress any inculpatory statements made while she was in custody. She specifically claimed that her statements were inadmissible because they had been obtained in violation of the Fifth Amendment rights developed in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966), *rehearing denied*, 385 U.S. 890, 87 S.Ct. 11, 17 L.Ed.2d 121 (1966). During the hearing, defendant also presented some evidence tending to show she was suffering from a mental illness at the time she admitted participation in the crime charged.

When the appeal was first submitted, it became apparent that the record did not show "with unmistakable clarity" that the defendant's admissions were voluntarily made, as required by *Sims v. Georgia*, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967). Following the practice suggested in *State v. Glenn*, 429 S.W.2d 225, 237–38[29–30] (Mo. banc 1968), and *State v. Auger*, 434 S.W.2d 1, 6–7[9] (Mo.1968), we requested the trial court to make express findings on the record evidence whether the defendant's inculpatory statements were, in light of her history of mental illness, voluntary, and whether defendant knowingly and intelligently waived her *Miranda* rights, either expressly or implicitly. No evidence except that already in the record was to be considered by the trial court in making its findings. In due course, those findings were filed here and made part of the record. Copies of the findings were furnished to counsel. The findings will not be set out at length here,

but will be quoted in the course of the opinion.

As we have said, the appeal is focused upon the admissibility of three inculpatory statements which were undoubtedly the basis for defendant's conviction. The admissibility vel non of those statements is tendered by counsel's assignments I and II primarily in terms of "voluntariness." After an opinion had been prepared and filed, defendant's counsel filed a vigorous motion for rehearing, contending that we had overlooked a material matter of fact. We believed we had, and in consequence withdrew our opinion to give the salient points entirely fresh consideration. Further study of the record only confirms our original conclusion that the inculpatory statements were admissible.

One or two preliminary observations are appropriate. First, a general discussion of the "voluntariness" doctrine as applied to admissions and confessions—assuming there is a difference—is well beyond the scope of this opinion. It has been more than adequately discussed elsewhere.[1] The only aspects of the "voluntariness" doctrine we undertake to examine in connection with this case are: (1) whether the evidence of defendant's mental illness was such as to preclude her making a voluntary confession of her participation in the crime charged, and (2) whether the defendant received a warning of her constitutional rights as elucidated in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602,[2] and thereafter knowingly and intelligently waived those rights.

I

■ The aspect of this appeal which has caused this court the most concern is whether the defendant's admitted chronic mental illness was such as to render her

inculpatory statements "invalid." The defendant moved to suppress her admissions of guilt before trial, as provided by Rule 24.05, and renewed her objection on the ground of mental incapacity at the time of trial. Such being the case, the trial court was required to put the issue of voluntariness to the jury. *State v. Mitchell*, 611 S.W.2d 211, 214 (Mo. banc 1981); *State v. Washington*, 399 S.W.2d 109, 113–14[12] (Mo.1966). Upon trial, the court allowed the defendant to make proof of her mental condition at the time she admitted her criminal agency, and submitted the issue of voluntariness to the jury by giving MAI–Cr 2d 3.44 as Instruction No. 15. The trial court also submitted the statutory defense of not guilty by reason of mental disease or defect excluding responsibility to the jury under proper instruction. In the course of presenting this defense, the defendant presented all the proof of "voluntariness" for a second time.

The trial court made the following findings concerning the defendant's mental illness as it affected the "voluntariness" of the defendant's incriminating admissions:

"(4) Verdia Miller for a period of time, commencing at least as early as 1978, has been treated and hospitalized for mental disorders variously described as Borderline Personality, Borderline Schizophrenia, Pseudoneurotic Schizophrenia, Hysterical Personality, Schizophrenia Cronic Undifferentiated. Since 1978, she has had periods when professionals treating her have felt that she has been free of mental disease on the one hand all the way to mental disease or defect within the meaning of Chapter 522, R.S.Mo. on the other hand. Stress induced by personal and family problems, use of alcohol and drugs, and criminal charges have adversely affected her mental condition

1. See W. LaFave and J. Israel, Criminal Procedure § 6.2, pp. 439–49 (1984) [hereinafter *LaFave* and *Israel*]; W. Knox, M. Berger and R. Duncan, 19 Missouri Practice Series, Criminal Practice and Procedure §§ 89, 90, p. 132–38 (1985) [hereinafter *Knox* and *Berger*]. The discussion last cited carefully collates the Missouri authorities.

2. That the receipt, appreciation and waiver of *Miranda* rights may indicate the "voluntariness" of an inculpatory statement, see *LaFave* and *Israel* at 448; *Knox* and *Berger* 136–37. See: *State v. Olds*, 569 S.W.2d 745, 751–52 (Mo. banc 1978); *State v. Trask*, 581 S.W.2d 417, 420[6, 7] (Mo.App.1979).

at the time of the particular stressful event.

(5) Dr. Paul L. Barone, M.D. of the Nevada State Hospital saw Verdia Miller on January 24, 1983, within two weeks of the three occasions on which she made the inculpatory statements challenged by her motion to suppress. Dr. Barone found that Verdia Miller (1.) does have a mental disease or defect within the meaning of Section 552.020; (2.) that she has the capacity to understand the proceedings against her and can assist her counselor in her own defense; that she did know and appreciate the nature, quality and wrongfulness of her alleged conduct and was capable of conforming her conduct to the requirements of the law; that the accused still hears voices and does require further hospitalization in the future. This Court finds Dr. Barone's conclusions and diagnosis accurately reflects Verdia Miller's mental condition on the three instances in issue, and that his conclusions should be and the same are adopted as factual findings of this Court.

(6) The medical findings and conclusions made by the medical professionals are not conclusive and in fact are not particularly helpful in determining the issue as to the voluntariness of the inculpatory statements made by Verdia Miller."

To determine whether the trial court's findings are supported by the evidence, and in cases where "voluntariness" is the issue, we look to the "totality of the circumstances." *State v. Flowers*, 592 S.W.2d 167, 168–69[1] (Mo. banc 1979). There are three distinct sources of information bearing on the defendant's mental capacity to confess voluntarily in January 1982.

(a)

The defendant produced a literal sheaf of documents, admitted upon trial and considered by the trial court upon remand for findings. These documents, as well as Dr.

Barone's report, amply sustain the trial court's finding that the defendant had been treated at various times for mental illness. It is a reasonable conclusion that she had chronic mental illness which varied in intensity from time to time. The mental evaluation which most immediately preceded the questioned statements appears as page two (2) of the "closing summary" of defendant's Exhibit C. This exhibit includes an evaluation of defendant's mental condition made by a clinical psychologist at the Ozark Community Mental Health Center on January 11, 1982, only 4 days before the defendant's initial admission was made. We quote paragraphs 1, 2, 3 and 7 of that appreciation by the clinical psychologist:

"1. & 2. This 39 year old black female came into the Center for an emergency intake interview due to gross interruption in her sleep cycle for the past two evenings. Mrs. Miller indicated that this could be related to drug withdrawal as well as acute anxiety over court testimony which was to be given this Friday, 1/15/82. Mrs. Miller further complained of loss of appetite and shakiness over her extremities.

3. It should be noted at this point that Mrs. Miller is well known to the Ozark Community Mental Health Center, but that her present complaints stem from New Year's Day when she indicated she had taken one Preludin, approximately 8 to 12 ounces of Scotch, and smoked some marijuana.[3] Since this time, New Year's Day of 1982, Mrs. Miller indicated she has wanted to stay clean but has been anxious over the court trial. At one point during the interview she mentioned that she thought she could benefit from hospitalization but did not want any medications if she were hospitalized.

7. Client was oriented to time and place, but was a bit tangential in her thought processes in the present tense. There appeared to be *no* delusions *nor*

---

**3.** We find by reference to the 1985 Physician's Desk Reference, pp. 710–11, that Preludin is a brand of phenmetrazine hydrochloride and is related chemically and pharmacologically to the amphetamines. The noted possible "Adverse Reactions" include dysphoria and rarely, psychotic episodes at recommended doses.

hallucinations present at the point of interview. Client did appear acutely anxious, but appeared to be seeking hospitalization for her acute anxiety, and it should be noted there appeared [to be] some malingering going on on the client's part, at the point of the initial interview, in this clinician's judgment." (Our emphasis.)

The final diagnosis was "Other interpersonal Problems," "Other Schizophrenia (Pseudo-neurotic)," and "Gross interruption in Sleep Cycle and Appetite and Polydrug Abuse." The conclusion which might have been drawn from this document is that the defendant was suffering from chronic mental illness exacerbated by debauchery but exhibited no misperception of reality at the time of interview.

(b)

Each of the witnesses to whom admissions were made was asked, upon trial, about the defendant's appearance and manner of speech at the time of the particular interview. Sheriff Abramovitz was acquainted with the defendant. He had talked to her on several occasions, had visited her when she was in the hospital and knew that she had had "some problems." The sheriff was asked the following questions about defendant's appearance on the day she made her inculpatory statement to him:

\* \* \* \* \* \*

"Q. She make any unusual statements to you?

A. This statement was the only one she made to me.

Q. Okay, she wasn't talking funny or rambling on?

A. I didn't notice that she was. She may have been. I didn't notice it."

Cpl. Don Richardson, a plainclothes investigator for the State Highway Patrol, took a long statement on a tape recorder from the defendant. He also had talked with and was acquainted with the defendant. Upon trial, this officer testified that when he asked the defendant questions, her answers "weren't confusing, but [defendant] might stutter from time to time ... and [defendant] has a certain street lingo that she uses." The matter was pursued further and Cpl. Richardson was asked:

"Q. So it's your testimony there was nothing, so far as you knew, there was nothing wrong or different about Verdia Miller in the Jasper County Jail on January 17, 1982?

A. As far as her physical appearance and her actions, she didn't act any different to me than she had on other occasions that I had talked with her. She acted normal on that date, but she did act differently on that date than she is acting today."

Mr. Lentz, the prosecutor who undertook to take the defendant's deposition on January 18, 1982, was asked if he saw or noticed anything unusual about the defendant's demeanor when her deposition was taken. Mr. Lentz answered:

"A. She was very wordy when she was giving this confession of killing this guy, more so than she had been before.

Q. Okay, she acted a little bit different this time, is that correct?

A. She verbalized differently, yes.

Q. She kind of rambled on through your questions, is that correct?

A. On occasion, she did, yes.

\* \* \* \* \* \*

Q. Didn't you have to tell her to stop and answer the question and get back to what you were asking several times?

A. I did tell her that. I don't know that I had to.

Q. And she would get off the track and go off on some tangents quite a few times, isn't that correct?

A. On occasion she did, yes."

\* \* \* \* \* \*

Mr. Lentz also testified that the defendant made one long, sing-song and irrational answer in response to a question about the handgun which was used in the killing. This statement was read to the jury.

(c)

The trial court ordered that the defendant be examined at the Nevada State Hospital to determine whether she was suffering from a mental disease or defect which would prevent her prosecution, as required by § 552.020.2, RSMo 1978, as amended, Laws of Mo.1980, p. 515, § 1.[4] Finding No. 5 indicates that the trial court relied heavily upon the report of Dr. Paul L. Barone, filed in response to its order. On motion for rehearing, counsel for defendant suggested that any such reliance on the report was misplaced, and called attention to the trial court's error in assuming that the report was made "within two weeks" of the three occasions on which she made the inculpatory statements challenged in her motion to suppress. That error is patent, but the result of the error is not of the magnitude counsel suggests, because the report also includes the "detailed findings" called for by the statute.

In the "Summary of Findings" the report reveals that defendant had been admitted to the Nevada State Hospital on three different occasions. To be accurate at the expense of brevity, we quote:

"Mrs. Verdia Miller was admitted on three different occasions to this facility. The first one being 7–31–79 at which time she was admitted on a 96 hour detention and evaluation. At that time the physician felt that she was suffering from schizophrenia chronic undifferentiated. She was discharged 8–2–79. Her second admission was 8–18–80 at which time the physician felt that her diagnosis was specified substance dependence. Third admission was 5–2–82. At the time of discharge 5–26–82 the physician felt her diagnosis was no mental illness,

# 2–drug abuse, per history, and # 3–alcohol abuse, per history. She was referred to us at this time by order of the Circuit Court of Newton County."

Dr. Barone concluded after evaluation that the defendant did have a mental disease within the meaning of Section 552, and that she was and had been chronically schizophrenic for many years. He also concluded that the defendant had the capacity to understand the proceedings against her and could assist her counselor in her own defense. Further, Dr. Barone considered that the defendant knew and appreciated the nature of her conduct at the time the offense was committed and was capable of conforming her conduct to the requirements of the law. The report also shows that the defendant "could work math problems on paper. She could work consecutive sevens. Client is aware of the Governor of Missouri and could name the last five Presidents of the United States."

Dr. Barone, a psychiatrist of 45 years' experience, did not testify at the suppression hearing but he did testify on trial. He steadfastly refused to give a firm opinion as to the rationality of the defendant's confessions, but he was asked:

"Q. Okay, '83, but '82 wasn't it the finding in 1982 when she was examined at the Nevada State Hospital, that she did not suffer from a mental disease or defect?

A. Yes, and that it was drugs.

Q. Drug abuse, that was '82?

A. Yes, sir.

Q. That was four or five months after she gave those statements.

A. Yeah.

---

4. Section 552.020.1 provides that "No person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures." Section 552.040.3 also required the report to include "(1) An opinion as to whether the accused, as a result of a mental disease or defect, lacks capacity to understand the proceedings against him or to assist in his own

defense." Section 552.020.4 also required, in cases where the defendant had pled mental disease or defect, that the evaluation include "(1) Detailed findings; ... (3) An opinion as to whether at the time of the alleged criminal conduct the accused as a result of mental disease or defect did not know or appreciate the nature, quality or wrongfulness of his conduct or as a result of mental disease or defect was incapable of conforming his conduct to the requirements of the law."

Q. No mental disease, suffering from drug abuse?

A. Sure."

During the trial, Dr. Barone firmly adhered to his diagnosis that the defendant was suffering from chronic schizophrenia, and should receive medication to alleviate her symptoms. Such, we think is a fair recital of the evidence bearing upon the defendant's capacity to make a "voluntary" admission in January of 1982.

## II

What, then, is the law governing the "voluntariness" of admissions made by a defendant who suffers from chronic mental illness? In *Blackburn v. Alabama,* 361 U.S. 199, 208, 80 S.Ct. 274, 280–81, 4 L.Ed.2d 242 (1960), the United States Supreme Court held that the test for "voluntariness," when there is evidence of mental disorder, is whether the admission of guilt is the "product of a rational intellect and a free will." The phrase "product of a rational intellect and a free will" is a euphonious abstraction, but we are still left with the question whether some impairment of a defendant's cognitive function is compatible with a constitutionally "voluntary" admission.

One criterion, formulated by Professor Henry Weihofen, is stated thus:

"For a defendant to make a valid confession, he must have had sufficient mental capacity at the time to be conscious of the physical acts performed by him, to retain them in his memory and to state them with reasonable accuracy."

H. Weihofen, Mental Disorder as a Criminal Defense 455 (1954). This test has been adopted by the Supreme Court of New Mexico on two different occasions. *State v. Lujan,* 87 N.M. 400, 534 P.2d 1112, 1113[3] (1975), *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 400 (1975); *State v. Sisneros,* 79 N.M. 600, 446 P.2d 875, 880

(1968). The defendant's ability to work elementary math problems and her ability to recall the names of government officials even when her mental illness was exacerbated suggests that the defendant met Professor Weihofen's standard. Kansas seems to have taken the position that the test for determining whether a suspect has the mental capacity to make a voluntary confession is the same as the test for determining his criminal responsibility for committing the crime. *State v. Boan,* 235 Kan. 800, 686 P.2d 160, 165[2, 3] (1984).

Most jurisdictions we have examined conclude that mental illness or deficiency does not itself preclude admission of a defendant's confession as long as he is capable of understanding the meaning and consequences of his statements. It is said to be an important factor to be considered in examining the totality of the circumstances, but it is not conclusive. *State v. Phelps,* 696 P.2d 447, 451[1] (Mont.1985), and cases there cited. The court further held that a diagnosis of schizophrenia was not conclusive on the question of voluntariness. *Id.* at 451. Courts in other jurisdictions have reached substantially the same conclusion. *People v. Watson,* 75 Cal. App.3d 384, 142 Cal.Rptr. 134, 140–41 (1977).[5] In *Criswell v. Nevada,* 86 Nev. 573, 472 P.2d 342, 343 (1970), *cert. denied,* 400 U.S. 946, 91 S.Ct. 251, 27 L.Ed.2d 257 (1970), the court held that a schizophrenic condition

" ... is a factor that, along with all other relevant factors, may be considered by a district judge in determining whether a confession was voluntarily given. But such a mental disturbance itself will not necessarily preclude the admissibility of a confession by one afflicted, so long as the defendant is mentally capable of understanding the meaning and consequences of his statements. [Citations omitted]."

5. "A schizophrenic condition does not render a defendant incapable of effectively waiving his rights ... [n]or does the presence of evidence of subnormality require the automatic exclusion of a confession.... And contrary to defendants

argument, neither the consumption of alcohol nor ingestion of drugs alone compels the conclusion that a defendant is incapable of intelligently waiving his rights...." 142 Cal.Rptr. at 140–41 [citations omitted].

Other cases might be cited; the view we have set out seems to be the view expressed by modern commentators. *LaFave and Israel*, p. 32–33, n. 106 (Supp.1986). There is also some indication in the record that the defendant's behavior suggesting affective or emotional disturbance was the result of her voluntary ingestion of or withdrawal from drugs. This court has previously held and reaffirms its view that a confession obtained from one addicted to, or under the influence of drugs is not necessarily involuntary. *State v. Kimball*, 613 S.W.2d 932, 943 (Mo.App.1981).

In the case before us, there is every indication the defendant understood the meaning and consequences of her statements. Anxiety about her confession was the principal source of her difficulty when she voluntarily checked herself in to the Community Mental Health Center at Neosho a few days before she confessed; Cpl. Richardson in particular advised the defendant that changing her testimony would implicate her and the various *Miranda* warnings given, which we shall presently discuss, were indications of the consequences of her admissions. Further, the two expert mental evaluations nearest the confession dates disclosed no existence of active mental disease. We are not concerned on this appeal with the *form* of the trial court's findings. The question on appeal is whether the evidence was sufficient to sustain the trial court's finding that the statements were voluntarily given. *State v. Alewine*, 474 S.W.2d 848, 852[3] (Mo. 1972). Our independent and exhaustive review of the evidence convinces us that the defendant was capable, in fact fully aware of the meaning and consequences of her admissions. They were admissible in evidence.

### III

A related but distinct claim of error is that the defendant's inculpatory statements were "involuntary" because the defendant did not knowingly and intelligently waive her right to refrain from self-incrimination and her right to have counsel present as required by *Miranda*. The trial court made findings concerning this assignment of error, as follows:

"(7) On all of the three occasions herein involved, Verdia Miller was advised of her rights under *Miranda v. Arizona* 384 U.S. 436, 86 S.Ct. 1602 [16 L.Ed.2d 694] (1966), prior to interrogation; on each of said occasions Verdia Miller understood her rights under *Miranda;* and on each of said occasions she was not induced, coerced or threatened to make the inculpatory statements. On no occasion did she ask for counsel.

(8) Verdia Miller is a deeply religious person.

(9) Verdia Miller's contact with Sheriff Joe Abramovitz on January 15, 1982 was initiated by Verdia Miller. She approached him and said, 'Sheriff, I have to talk to you.' Although, she did not wish to sign a waiver of rights form, she did talk freely with Sheriff Abramovitz in the presence of his secretary, Kay Ellis. Sheriff Abramovitz was dressed in civilian clothes and did not have a visible weapon. Verdia Miller was dressed in a white outfit. Her conduct was not abnormal or unusual.

(10) Don Richardson made his January 17, 1982 contact with Verdia Miller at the Jasper County Jail after talking with Sheriff Abramovitz and after learning of the contents of her statement made on January 15 to Sheriff Abramovitz. Richardson was dressed in civilian clothes and had no visible weapon. The interrogation took place in the interrogation room at the Jasper County Jail. Verdia Miller was dressed in white. Richardson had knowledge that Verdia Miller had been refusing food items which were not white in color. Verdia advised Richardson that she had been hallucinating or tripping out or freaking out. She assured him she was competent to make a statement and that 'I just want to come clean. Its been very weighing on my mind and I can't rest.' Her statement was made on a tape recorder with her knowledge. Richardson assumed she was dressed in white because of her reli-

gious beliefs. She was not threatened; no promises were made to her; and she did not request an attorney.

(11) The deposition of Verdia Miller as the principal witness in the murder trial of State v. Edward Jackson was taken on January 18, 1982 by Gary Lentz, Prosecuting Attorney of Newton County. Lentz, before taking the deposition, knew that Verdia Miller had told Sheriff Abramovitz and Don Richardson of her advance knowledge that Jackson planned to kill Smiddy and that she had told of supplying the gun and gloves. She was not promised anything and she was not threatened. She did not ask for counsel. During the deposition she admitted her involvement in the murder. She was dressed in white and was 'wordy'. During the deposition her answers trailed off to a tangent at times and at one time she asked Lentz if he saw the spirit. One long tangential answer had reference to the gun that Jackson used.

(12) This Court finds that at all times pertinent herein, Verdia Miller was not under arrest on any charge, but was being held in protective custody at her own request, and that she was advised of her rights under *Miranda* and that she understood her rights.

(13) At all times pertinent herein Verdia Miller intelligently and understandingly waived her right to counsel as delineated in *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232 [51 L.Ed.2d 424] (1977), and Oregon v. Bradshaw, 462 US. 1039, 103 S.Ct. 2830 (1983). Verdia Miller's waiver of counsel was implicit."

Our examination of the record confirms in our minds that the trial court's findings are correct. We conclude that defendant was given a *Miranda* warning immediately prior to making each of the three sets of admissions. On each of the three occasions, the defendant said she understood her rights. The only real question of law before this court is whether she waived her *Miranda* rights. It has been established

since *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), that an explicit statement of waiver is not invariably necessary to support a finding that the defendant waived the right to remain silent or the right to counsel guaranteed by the *Miranda* case. Butler also teaches:

"The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. As was unequivocally said in *Miranda,* mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights...."

*Id.,* 441 U.S. at 373, 99 S.Ct. at 1757.

After reviewing the state and federal precedents, the court held:

"Even when a right so fundamental as that to counsel at trial is involved, the question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'"

*Id.,* 441 U.S. at 374–75, 99 S.Ct. at 1758.

What, then, are the circumstances indicating waiver of the right to remain silent and the right to have counsel present at interrogation in this case? Refusal to sign a written waiver form does not preclude a finding of waiver. *United States v. Boston,* 508 F.2d 1171, 1175 (2d Cir.1974), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975).[6] But specifically, it is significant that the incriminating statements on each occasion immediately followed the *Miranda* warning. 1 W. LaFave and J. Israel, § 6.9, p. 531 (1984); see: *Billings v. People,* 171 Colo. 236, 466 P.2d 474, 476 (1970) (dictum). Also significant are the general tenor and breadth of the defendant's statements to Sheriff Abramovitz and to Officer Richardson. Weighed

---

6. See also the authorities collected on this point in the second paragraph of footnote 5, *North*

*Carolina v. Butler,* 441 U.S. at 375, 99 S.Ct. at 1758.

together, they are indicative of a desire to cooperate and they indicate a desire to enter into a generalized discussion of the investigation. See: *United States v. Boykin,* 398 F.2d 483, 484[1] (3d Cir.1968), *cert. denied,* 393 U.S. 1032, 89 S.Ct. 645, 21 L.Ed.2d 575 (1969) [I " 'might as well tell you about it' "]; *Brown v. State,* 3 Md. App. 313, 239 A.2d 761 (1968) [defendant came to police station and made a statement]; LaFave and Israel, op. cit. at p. 531; cf. *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983). Further, the record indicates the incriminating statements were not the product of improper threats, coercion or leniency. *State v. Rickey,* 658 S.W.2d 951, 953–54[1, 2] (Mo.App.1983). There is a record basis for the trial court's finding that the defendant knowingly and intelligently waived her *Miranda* rights, albeit implicitly.

## IV

■ The defendant also alleges that the trial court erred in failing to declare a mistrial, grant a continuance or apply an appropriate sanction for this reason: Upon trial, Cpl. Richardson testified that defendant had indicated at the time of Jackson's preliminary hearing that Jackson had told her he intended to kill Smiddy, but defendant didn't think he would do so. Counsel objected that this statement had not been disclosed; the State indicated it had not known about the particular statement so it could not disclose it.

The defendant did file a request for disclosure, and the State has a continuing duty to disclose any statements represented under the disclosure rules. *State v. Smothers,* 605 S.W.2d 128, 130 (Mo. banc 1980), *cert. denied,* 450 U.S. 1000, 101 S.Ct. 1708, 68 L.Ed.2d 203 (1981). The State is not to be censured, however, for disclosing what it does not know. The defendant now contends, in addition, that the court should have conducted a second hearing on the voluntariness of the defendant's statement made at the preliminary hearing.

We have examined the record, and we find no reason for a second hearing, which the defendant insists should have been held. Cpl. Richardson was asked by defense counsel how many times he had spoken to the defendant about the crime. Richardson replied that he had spoken to the defendant several times in 1981. Counsel for defendant then put these questions to Richardson:

"Q. Were you present at the preliminary hearing on the charge against Edward Scott Jackson?

A. Yes.

Q. Did the defendant—had she told you what she testified to that day previously? Had she given her statement to you?

A. Yes.

Q. What was her statement with regard to her involvement in the Larry Dean Smiddy killing?

A. During the preliminary hearing with Mr. Jackson?

Q. During the preliminary hearing or before that?

A. Okay, her story at that time was that Mr. Jackson had brought Mr. Smiddy over to Verdia's house early in the morning, and along with Bobby Joe Mingo they had partied or socialized there for a while, and that then Mr. Shyster or Mr. Jackson had told Verdia that he planned to take this white man out and kill him, and Verdia went with him under some fear or some coercion, and as she went out there she said she didn't think he would do it, and he did do it, and she was afraid at that point."

Defendant's counsel thereupon approached the bench and stated to the trial court that "This completely surprises the defendant. I object to it on the basis it hasn't been disclosed, and I think the only appropriate remedy is a mistrial." The State responded that it was also surprised by the answer which Richardson had given. The State suggested that the defense could, if it wished, ask questions on voir dire to discover if any other statements not disclosed had been made. The defense maintained it would first ask for the sanction of a mistrial. Defense counsel was

then given a recess "to prepare for the voir dire hearing." Whether counsel took advantage of the opportunity to talk with the witness is not shown. Counsel did, however, move for an additional *Denno* hearing to determine the admissibility of the statement. The trial court denied the motion. The interrogation of Cpl. Richardson was resumed:

\* \* \* \* \* \*

"Q. Did you advise her of her constitutional rights before talking with her in 1981?

A. No, she was a willing witness, and we talked on a semi-regular basis. I was not advising her of her rights because she was helping the State.

Q. She was not in custody at that time?

A. No, she wasn't.

Q. Or under suspicion at that time?

A. No, she was not."

The defendant did file a request for disclosure, and the State had a continuing duty to disclose any statements requested under the discovery rules. *State v. Smothers*, 605 S.W.2d at 130. The State is not to be censured, however, for not disclosing what it did not know. The defendant also asked for a second suppression hearing, specifying that he had *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), 1 A.L.R.3d 1205 (1964), in mind. There was no necessity for a second hearing. *Miranda* itself holds that it is applicable only " ... when an individual is taken into custody or otherwise deprived of his freedom ... in [some] significant way ...", *Miranda v. Arizona*, 384 U.S. at 478, 86 S.Ct. at 1630, and as against the "voluntariness" argument, denial of the right to counsel, failure to advise of the right to remain silent and diminished mental capacity do not in themselves establish coercion; such considerations are relevant only in establishing a setting in which actual coercion might have been exerted to overcome the will of the suspect. *Procunier v. Atchley*, 400 U.S. 446, 453–54, 91 S.Ct. 485, 489, 27 L.Ed.2d 524 (1971), *rehearing denied*, 401 U.S. 966, 91 S.Ct. 966, 28 L.Ed.2d 249

(1971). Counsel is thus in the untenable position of insisting that defendant should have been offered a second *Denno* hearing to determine whether *Miranda* rights were violated at a time when they had not attached, and at a point during the trial when the trial court already had sufficient information before it to determine whether her mental incapacity was such as to render her statements "involuntary."

Moreover, this contention and others presented distort the record. The statement with which counsel's third and fourth points are concerned was not, on careful examination, inculpatory. She did not admit participation; she maintained, as she did until 1982, that whatever she had done was the result of fear and coercion. Further, we note that full reconsideration on the record by the trial court, followed by independent analysis of the record by the appellate court, more than satisfies the substantive due process requirements underlying "voluntariness." Cf. *Swenson v. Stidham*, 409 U.S. 224, 229–30, 93 S.Ct. 359, 363[1], 34 L.Ed.2d 431 (1972). The contention is without merit.

The defendant has briefed one more additional point. This court has twice resolved that its constitutional mandate does not require it to answer a meritless point simply because it was advanced on appeal. *State v. Trimble*, 654 S.W.2d 245, 259–60[32] (Mo.App.1983); *State v. Pugh*, 600 S.W.2d 114, 116 (Mo.App.1980). Our colleagues at St. Louis have agreed with us. *State v. Johnson*, 684 S.W.2d 584, 585–86 (Mo.App.1985). The point is wholly without merit and we decline to discuss it. Accordingly, the judgment is affirmed.

PREWITT, C.J., and MAUS and CROW, JJ., concur.