Filed 5/17/22  P. v. Coffer CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br>        Plaintiff and Respondent,<br>v.<br><br>JOHNATHAN CHRISTOPHER COFFER,<br>        Defendant and Appellant. | A158563<br><br>(Alameda County Super.<br> Ct. No. 18CR001088) |

Defendant Johnathan Christopher Coffer appeals from his convictions for sexually assaulting two women, one after the other, in an abandoned home on the night of January 12, 2018.  He contends the trial court abused its discretion when it denied his post-trial motion under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) to replace his defense counsel, erred in giving the jury a flight instruction under Penal Code section 1127c[1] because there was no evidence to support it, and erred in sentencing him to a one-year prior prison term enhancement sentence under section 667.5, subdivision (b) based on the retroactive application of a change in that statute.  We affirm, except that we strike the one-year prior prison term enhancement and remand the case to the trial court for resentencing.

---

[1] All statutory citations are to the Penal Code unless otherwise stated.

1

## BACKGROUND

In January 2019, the Alameda County District Attorney filed an amended information charging Coffer with two counts of forcible rape (§ 261, subd. (a)(2)), two counts of forcible oral copulation (§ 288a, subd. (c)(2)(A)) and one count of second degree robbery (§ 211). The first four counts included allegations of multiple victims. As to all counts, it was alleged that Coffer had suffered a prior strike offense, two prior serious felony convictions and three prior prison terms.

## I.

### *Evidence Presented at Trial*

Evidence was presented at a subsequent jury trial that at around 3:00 a.m. on January 12, 2018, two women who were best friends, S.D. and C.D., arrived by car at a house located at 433 Elsie Avenue in San Leandro, California. S.D. had agreed by text message to meet Coffer there to perform sex acts for $120 after he responded to the women's online escort ad. When they reached the house, C.D. called Coffer. She saw a light flash through the gate of another house, later identified by police as 420 Elsie, and was told by Coffer to meet him there instead of at 433 Elsie. She and S.D. met Coffer on the porch of 420 Elsie and C.D. went inside with him.

The inside was empty except for a Christmas tree. When C.D. asked Coffer for payment, he directed her to a bare room with a mattress on the floor in the back of the house. When C.D. again asked about payment, Coffer grabbed her hair and forced her to get on her knees and orally copulate him. When she refused his further demands, he choked her, banged her head against the wall and penetrated her vagina with his penis against her will for

2

"a good 20 minutes." He wore a condom, and at trial C.D. identified its wrapper in a photograph.

When Coffer was done, C.D. dressed and used the bathroom. Coffer said she was not leaving and that they could work together. She saw tattoos on his shoulder and neck. She resisted his demand that she call S.D. until Coffer said she would die unless S.D. came into the house. C.D. called S.D., who agreed to have oral sex with Coffer for $120. C.D. did not tell S.D. what Coffer had done to her.

S.D. met C.D. and Coffer on the porch of 420 Elsie and went inside with Coffer. C.D. remained outside. Coffer sexually assaulted S.D. much as he had C.D., including forcing her to orally copulate him and penetrating her vagina with his penis against her will until he realized S.D. was having her period. He then stopped, took the phone S.D. had with her, which was actually C.D.'s, and let her leave the house.

C.D. and S.D. called the police from their car. They reported that S.D. had been raped, forced to perform oral sex and robbed. They described tattoos on Coffer's neck and arms, falsely claimed Coffer had a gun and lied about where they had met Coffer. C.D. continued to withhold the fact that Coffer had also assaulted her. During the call, S.D. could see Coffer's phone flashing from inside 420 Elsie.

Police quickly arrived at the scene and questioned the women separately. The two ultimately disclosed why they were there and what had happened. They could not identify Coffer by name but accurately described the inside of 420 Elsie Avenue, and C.D. described a cell phone case that police later found in the back bedroom of the house. Soon after police arrived, one of the officers noticed a light in the back of the house at 420 Elsie and

3

police, using an application on the phone C.D. had kept with her, tracked the phone Coffer had taken from S.D. to that address. At 4:01 a.m., after the police had arrived, S.D. received a text asking for C.D.'s password, to which she replied, "[Y]ou raped me."

The police set up a watch of both the house at 420 Elise and the one behind it at 467 Maud Avenue. About 20 to 25 minutes after police first arrived, the officers watching 420 Elsie heard shuffling noises in the backyard at that address that sounded like someone jumping a fence. A man matching Coffer's description, with a tattoo on his neck, emerged from the backyard. Testimony at trial indicates that in video footage from an officer's body camera, Coffer first said he lived at 467 Maud and then acknowledged that he did not. Asked why he came out the back, he said he was "like a transient." Coffer, asked by police if he lived with his mother at 420 Elsie, said he had been sleeping in the back there. He was wearing a GPS monitor, and two gold-wrapped Trojan condoms were found in his pants pocket.

At the scene, C.D. and S.D. identified Coffer as their attacker. In later interviews with police, S.D. said she had advertised her availability as part of a "two-girl special" in her online ad but at trial she could not recall doing so. Both she and C.D. said they did not initially tell the police that they went to meet Coffer for prostitution because they feared their claims would not be taken seriously. C.D. said she did not initially disclose her rape to S.D. so as not to upset her. Neither said what had happened "was just a failure to pay for services."

Police searching the back bedroom of 420 Elsie found a dent in a wall next to an open window consistent with someone hitting it while going

4

through the window, a chair outside beneath the window and a window screen on the ground. Coffer's fingerprints were found around the window.

After speaking to the officers at the scene, S.D. and C.D. received sexual assault examinations at a hospital. C.D. reported that she had neck and back pain. She said her attacker had held her arms, choked her with his hands, threatened to kill her, licked her neck, kissed her cheek, might have sucked her right breast, penetrated her vagina with his penis and forced her to orally copulate him. Her exam revealed tenderness on the right side of her head and face as well as "tender abrasions" on her posterior fourchette, a part of the vaginal opening.

S.D. reported her attacker had licked her left breast, and, using a condom, penetrated her vagina with his penis and forced her to orally copulate him. She declined a pelvic examination because she was having her period. A visual inspection of her did not disclose any relevant physical findings, which was not unusual in the case of sexual assault victims.

The women's medical examiner testified that at some point during their visit to the hospital, a police officer named Kambic told him one of the women had said it was not a rape but a case of sex work that was not paid for, something both women testified they did not say. The examiner testified that this information did not affect his conclusions that his examination findings were consistent with the histories C.D. and S.D. provided.

Officer Kambic testified that he spoke to one of the women at the hospital on the night of the incident. She told him she and a friend met Coffer to engage in prostitution, that she originally told police she was the only person to go into Coffer's residence but in fact her friend went in first, that when she asked Coffer about payment, he grabbed her hair and said,

5

"Bitch, you better give me some sex," so she knelt and orally copulated him, after which he penetrated her and took her phone. She also said she later learned from a police officer that the other woman had not been paid and that she too had been raped. She said she originally told police that she met Coffer at a different location to "smoke weed," which was not true. The officer did not remember telling the medical examiner, and testified that neither woman said, that this was not rape but a failure to pay for sex acts.

DNA was found on a sample taken from a swab of C.D.'s breast that to an almost mathematical certainty was Coffer's. S.D.'s breast swab contained a mixture of at least three contributors including at least one male, from which no further conclusions could be drawn.

A law enforcement officer who monitored people wearing GPS monitors testified that Coffer's residence of record was a building in the rear of 432 Elsie Avenue. GPS tracking data showed Coffer moving from 432 Elsie to 420 Elsie at about 5 p.m. on the evening of the incident and staying there until about 4:00 a.m., when he moved towards Maud Avenue.

The house at 420 Elsie Avenue was owned by a family who had leased it to a third party. The family had been unaware the tenant had moved out and had not given Coffer permission to be inside the house.

Both C.D. and S.D. had previously worked as prostitutes, including together in Los Angeles, and C.D. had been arrested for prostitution. Also, C.D. had been arrested multiple times for other offenses, including in 2014 for providing false identification to a police officer and in 2017 of providing a false name to a police officer (for which she was convicted), and had open criminal cases at the time of trial.

6

## II.

### *Evidence of Other Sexual Assaults by Coffer Admitted at Trial Under Evidence Code Section 1108*

A woman testified that in 2014, when she was an art student, Coffer befriended her in a San Francisco store. After talking with him, she went with him to his home in San Leandro to do her homework. He led her to a garage in the back of a house that had been turned into a living space.

When Coffer told her to sit on his bed, the woman, already uncomfortable, told him she wanted to go home and that she was there to do homework and nothing else. He replied by saying something like, "[W]e're grown, you came to my house so you know what we came to do." Scared, she sat on the bed, then stood up and said she wanted to leave. Coffer attacked her, removed her clothes, pushed her down onto the bed and penetrated her vagina with his penis against her will after putting on a condom. She successfully resisted his demand that she orally copulate him, at which point Coffer penetrated her with his penis a second time. Eventually he stopped and allowed her to leave. She told her ex-boyfriend, grandmother and police that Coffer sexually assaulted her.

Another woman testified that she had known Coffer since elementary school. In September 2006, she was 15, Coffer was 16 and they were friends. Coffer came to her house to hang out; her best friend was also there, in the downstairs area of the house. Coffer asked for a tour of the house, including the upstairs, and asked to see her room. In her room, they watched television for a time. He kissed her and she kissed him back, but when he asked if she wanted to have sex, she said no. They kissed again and Coffer pushed her down onto the bed, pulled down her pants, put on a condom and penetrated

7

her vagina with his penis despite her repeatedly telling him to stop.  He also forced her to orally copulate him.  He kissed her on the lips and left the house when he was done.

The woman told her best friend what had happened.  She did not tell her parents or police about it until the following year.  She "was scared because [her] biggest fear has always been disappointing [her] parents, and [her] father gave [her] explicit instructions that day not to let anyone else over to the house."  She gave police sexually suggestive text messages Coffer sent her a few months after the assault, to which she responded by telling him to delete her number and leave her alone and by blocking his number.

## III.

### *The Verdict, Sentencing and Appeal*

The jury convicted Coffer of all charges and found the multiple victim allegations to be true.  The court struck a prior conviction allegation and found the prior serious felony convictions and prison terms allegations to be true.

At the sentencing hearing, the court struck another prior conviction and sentenced Coffer to 13 years plus 30 years to life.  This included two consecutive terms of 15 years to life for his forcible rape convictions, two consecutive six-year terms for his forcible oral copulation convictions, a one-year term for his robbery conviction and a one-year consecutive term for a prior conviction.

Coffer filed a timely notice of appeal.

8

# DISCUSSION

## I.

### *The Trial Court Did Not Abuse Its Discretion in Denying Coffer's* Marsden *Motion.*

Coffer first argues that the trial court abused its discretion in denying his *Marsden* motion because he showed he was embroiled in an irreconcilable conflict with his court-appointed attorney, who had failed to adequately represent him at trial, and the conflict was likely to result in ineffective representation. Coffer made no such showing, and the trial court did not abuse its discretion in denying his motion.

#### A. The Relevant Proceedings Below

During trial, Coffer moved under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*) to represent himself. Coffer said he was unhappy with the representation of his court-appointed counsel, Sierra Dugan, and that he did not like the questions she was asking the witnesses. He believed her cross-examination questions were more like a prosecutor's and damaged his case, and thought he could present a more effective defense. He wanted to start the trial over again and recall witnesses to question himself. The trial court denied Coffer's motion as untimely, found it was unreasonable to re-cross-examine witnesses and concluded that Dugan had more than adequately represented him.

Three months after Coffer's conviction but before sentencing, he brought a motion under *Marsden* to have Dugan replaced as his counsel. Coffer told the court he was dismayed by Dugan's closing arguments to the jury, contending that as revenge for his *Faretta* motion she told the jury that he "fled the scene because of a rape" even though he had told her he had merely left an abandoned home. Also, Dugan told him not to testify because

9

of his priors and, as a result, the jury did not hear about his innocence; did not call a police officer who was key to his defense; and gave him S.D.'s and C.D.'s phone numbers so he might call them and further incriminate himself.

Dugan, an experienced criminal defense attorney, told the court that she did not tell the jury that Coffer left 420 Elsie because a rape occurred but that she did refer to the text message S.D. sent him stating he had raped her. Coffer's objections to her questioning of witnesses appeared to be because she asked leading questions, which she explained to him was appropriate on cross-examination. She gave Coffer a copy of her closing argument beforehand, which included phone numbers for S.D. and C.D. because she was going to explain to the jury "what phone number was doing what," not because she wanted him to call those numbers, which she understood were no longer working. She was not upset by Coffer's *Faretta* motion, knowing from her representation of him, including in the past, that he could get upset. She had known Coffer and his family for some time, had a lot of affection for him and cared about his family. She did not want Coffer to testify because it would have led to cross-examination on his priors that would have been harmful to his defense but, regardless, she "repeatedly and without any hesitation" left it to Coffer to decide whether to testify. She did not call the police officer Coffer referred to because the officer did not have any information helpful to the defense.

The trial court rejected Coffer's arguments. It concluded that Dugan gave him "sound" advice "that made a lot of sense in this case" and that in any event Coffer himself chose not to testify. The court did not recall Dugan saying that Coffer left the house because a rape had occurred and did not find fault with her argument. The court found untenable that Dugan gave him

10

the phone numbers of S.D. and C.D. so he would contact them, found no indication that Dugan changed her approach to Coffer's case after he made his *Faretta* motion, and thought she had represented him vigorously and done a very good job on his behalf. It found no indication that the police officer Coffer wanted her to call as a witness would have provided material evidence. The court found that Dugan had diligently represented Coffer, had investigated the facts, had made very good legal arguments, had called witnesses and had vigorously cross-examined the prosecution's witnesses. It concluded, "I do not find there's been a sufficient showing that Ms. Dugan's representation of [Coffer] has been inadequate, nor do I find that [Coffer] and counsel have such an irreconcilable conflict in their relationship that [in]effective representation is the likely result." It denied Coffer's *Marsden* motion.

After Coffer was convicted, the court held a hearing to consider a new trial motion made by Coffer and to impose sentence. Coffer again moved under *Faretta* to represent himself on his new trial motion. The court denied the motion, stating that it was untimely and that Dugan had "always acted extremely diligently and worked hard" on Coffer's behalf.

Coffer then told the court there were issues he raised during his *Marsden* motion that he wanted to add to the motion for a new trial. He said he was having an ongoing conflict with Dugan and was constantly "butting heads" with her. While he did not want a second *Marsden* hearing, he wanted to argue the motion for a new trial and represent himself at a new trial. After further discussion, the court granted a continuance of the hearing to allow Dugan and Coffer to confer.

11

Dugan filed a supplemental new trial motion on Coffer's behalf that included what appear to be Coffer's arguments. Nonetheless, when the hearing on the motion reconvened, Coffer interrupted the arguments of counsel to make arguments on his own behalf. When the court told him he did not have the right to argue, he again moved under *Faretta* to represent himself. The court indicated it would grant the *Faretta* motion and ordered a recess so Coffer could complete the appropriate form, but when it reconvened the hearing Coffer withdrew that motion. After the court rejected various arguments made in Coffer's new trial motion, Coffer renewed his *Faretta* motion repeatedly and the court denied it, finding Coffer was "just trying to delay these proceedings and be obstreperous." It denied Coffer's new trial motion.

### B. Analysis

"*Marsden* motions are subject to the following well-established rules. ' " 'When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citations].' [Citations.]" ' [Citation.] Denials of *Marsden* motions are reviewed under an abuse of discretion standard. [Citation.] Denial 'is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would "substantially impair" the defendant's right to assistance of

12

counsel.' " (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085; accord, *People v. Sanchez* (2011) 53 Cal.4th 80, 84, 89-90.) Substantial impairment of the right to counsel has occurred if the record shows counsel is not providing adequate representation or a defendant and counsel are embroiled in such an irreconcilable conflict that ineffective representation is likely to result. (*Sanchez*, at p. 89.)

Coffer argues that he showed he had an irreconcilable conflict with Dugan that was likely to result in her ineffective representation. He points to his contentions that Dugan "presented damaging and prejudicial arguments to the jury during closing," "failed to ask appropriate questions of the prosecution's witnesses," "failed to properly advise him regarding his decision to testify in his own defense," "made mistakes during her presentation of the defense case and failed to call necessary defense witnesses."

Coffer's arguments are unpersuasive for two reasons. First, the trial court could have reasonably concluded that Coffer's disagreements with Dugan amounted to nothing more than tactical disagreements that did not constitute irreconcilable conflicts and did not substantially impair his right to counsel, i.e., did not cause, and were not likely to cause, ineffective representation. "A defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense. [Citation.] Tactical disagreements between the defendant and his attorney do not by themselves constitute an 'irreconcilable conflict.' 'When a defendant chooses to be represented by professional counsel, that counsel is "captain of the ship" and can make all but a few fundamental decisions for the defendant.' " (*People v. Welch* (1999) 20 Cal.4th 701, 728-729.)

13

Second, while claiming he distrusted Dugan, Coffer has failed to establish that Dugan inadequately represented him. He fails to effectively counter the trial court's observations about the quality of Dugan's work on his behalf. The trial court reasonably could have concluded that Coffer was not embroiled in a genuine irreconcilable conflict but was simply ignoring Dugan's efforts and strategy decisions on his behalf, and instead was attempting to manufacture a crisis to delay the post-trial proceedings. (See *People v. Smith* (1993) 6 Cal.4th 684, 696 ["[A] defendant may not force the substitution of counsel by his own conduct that manufactures a conflict"].)

Contrary to Coffer's contention below, Dugan *did not* argue that he "fled the scene because of a rape which didn't occur." Rather, she argued that Coffer did not flee but waited for some time before leaving the house, leaving only when he learned from S.D.'s text message that she was accusing him of rape or saw there were police officers outside who might be aware he was transient and did not live at 420 Elsie. Dugan then argued that Coffer "probably didn't see that ['you raped me['] text message" based on his statements to the police, and that he did not flee out of consciousness of guilt. Dugan was reasonably contending with the evidence that was before the jury and offering it a perspective favorable to Coffer. Further, in arguing that Coffer may have left the house because he was transient, she was making an argument he apparently had urged her to make.

Coffer argues "there was some cause for concern on [his] part" regarding Dugan's closing argument because "[w]hen Dugan first addressed the flight instruction, she argued that [Coffer] did not immediately leave the house and remained there for about 30 minutes after the police arrived. But when she returned to that instruction, . . . she stated that [Coffer] might have

14

seen the text message from S.D. accusing him of rape. At that point, he fled the house. . . . She then offered an alternative theory, namely that [Coffer] did not see the text message and was aware of the officers outside the house." Coffer argues the jury could have misconstrued Dugan's remarks as supporting a finding that he was aware of his guilt.

Coffer has forfeited this argument by failing to raise it below. (*People v. Johnson* (2018) 6 Cal.5th 541, 574 [a defendant may not "argue on appeal that the trial court ought to have discharged counsel for reasons that the defendant failed to make known to the trial court at the time of the proceedings"].) But even if we reached the merits of the argument, we would reject it because there is no reason to believe the jury misconstrued Dugan's remarks.

Coffer also fails to point to a single instance where Dugan's cross-examination questions were in any way inappropriate. Further, Dugan represented that she explained cross-examination style to Coffer, from which the trial court could have reasonably concluded that the two were communicating and working together during trial. (See *People v. Jones* (2003) 29 Cal.4th 1229, 1245 [" 'To the extent there was a credibility question between defendant and counsel at the hearing, the court was "entitled to accept counsel's explanation" ' "].)

As for Dugan's purported failure to properly advise Coffer about his decision whether to testify, again, he fails to identify any reason to disagree with the trial court's finding that Dugan gave him sound advice. It is obvious that Coffer, had he testified, would have been subject to cross-examination on a variety of subjects, including but not limited to his prior crimes, which likely would have harmed, not helped, his case before the jury. Besides,

15

Coffer did not deny that Dugan left it to him to decide whether or not to testify, from which the trial court reasonably could have concluded the two were communicating and working together during the trial.

As for Coffer's complaints about Dugan's overall approach to his defense, the trial court could have accepted Dugan's representations regarding her trial tactics and her relationship with Coffer, which indicated she listened to him and explained to him all aspects of the case. (See *People v. Jones*, *supra*, 29 Cal.4th at p. 1245 [court entitled to accept counsel's explanation].) This includes Dugan's representations that Coffer himself chose not to testify and that the witness Coffer wanted her to call would add nothing to the defense.

Coffer contends that his disagreement with Dugan "was not merely one over trial strategy." Rather, he "was convinced that Dugan was not adequately pursuing all possible defense theories, was unprepared for trial, and had a fundamental misunderstanding of the law." Consequently, "this led to a complete breakdown in their relationship because [he] felt he could not communicate with Dugan and he could not trust her judgment." This too is unpersuasive. As we have discussed, Coffer was not entitled to ignore Dugan's reasonable explanations in order to manufacture a crisis. And in any event, that he may have distrusted Dugan or disagreed with her when they discussed his case does not show an irreconcilable conflict. (See *People v. Myles* (2012) 53 Cal.4th 1181, 1207 [irreconcilable conflict not shown "by defendant's assertions that he did not trust his attorney and 'collided' with him when they discussed the case"].) " 'If a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have

16

a veto power over any appointment, and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law.'" (*Ibid.*)

Coffer relies on two federal cases, *United States v. Williams* (9th Cir. 1979) 594 F.2d 1258 (*Williams*) and *United States v. Walker* (9th Cir. 1990) 915 F.2d 480 (*Walker*), overruled on another ground in *United States v. Nordby* (9th Cir. 2000) 225 F.3d 1053, 1059, to argue that he and Dugan were embroiled in an irreconcilable conflict. Those decisions are not binding on our state courts (*People v. Crittenden* (1994) 9 Cal.4th 83, 120, fn. 3) and in any event are distinguishable from this case because in both there is evidence of genuine irreconcilable conflicts. (See *Williams*, at pp. 1259-1261 [defense counsel did not refute a lack of communication with the defendant and confirmed that they had a "stormy" relationship "with quarrels, bad language, threats, and counter-threats"]; *Walker*, *supra*, 915 F.2d at pp. 484-485 [conflict between defendant and counsel was not based on "frivolous or manipulative grounds" and caused an undisputed "total lack of communication preventing an adequate defense"].)

In sharp contrast to those cases, the evidence here shows Dugan and Coffer communicated and Dugan presented an adequate defense consistent with Coffer's interests. Dugan communicated with Coffer throughout the trial and post-trial proceedings (such as when she explained cross-examination style to him, gave him a copy of her closing argument beforehand, submitted a supplemental motion for new trial with the arguments he requested and conferred with him at the hearings we have summarized). It also shows she considered his point of view and incorporated his thoughts into her approach (such as in giving her closing argument and in

17

filing a supplemental motion for a new trial) and discussed and explained her strategy to him (such as sharing her closing argument with him beforehand and explaining to him cross-examination style). And contrary to his contention that she was retaliating against him, she told the court that she felt no animus toward Coffer, had a lot of affection for him and understood that he could become upset.

Coffer's contentions that Dugan acted improperly at trial are not supported by the record and, thus, the trial court reasonably could have concluded they were manipulative. Coffer simply fails to address the trial court's comments about Dugan's efforts on his behalf, including that she presented "plenty of evidence about inconsistent things that [S.D. and C.D.] had said during this investigation." In other words, the record simply does not show that Coffer and Dugan had an irreconcilable conflict between them that substantially impaired his right to counsel.

Coffer also contends that the trial court failed to "directly address the issue of whether the relationship between [him] and Dugan had broken down to the point where ineffective assistance would result." This is not correct. The court stated, "I do not find there's been a sufficient showing that Ms. Dugan's representation of [Coffer] has been inadequate, nor do I find that [Coffer] and counsel have such an irreconcilable conflict in their relationship that effective representation is the likely result." Coffer fails to explain why this finding was an abuse of discretion.

Finally, Coffer argues that Dugan's "deficient" arguments during the hearing on his new trial motion, which occurred after the court denied his *Marsden* motion, also demonstrated a breakdown in their relationship and her ineffective assistance. We disregard this argument because we "assess

18

the trial court's ruling only on the facts made known to it at the time it made that ruling." (*People v. Hernandez* (1999) 71 Cal.App.4th 417, 425.) Even if we were to consider it, Coffer ignores that Dugan presented his arguments for a new trial in a supplemental motion, demonstrating that their relationship had *not* broken down as he describes.

In short, Coffer's argument that the trial court abused its discretion in denying his *Marsden* motion lacks merit.

## II.

### *The Trial Court Did Not Err in Giving the Flight Instruction.*

Coffer next challenges the trial court's instruction to the jury that, if it concluded Coffer had fled from the scene of the incident, it could infer his consciousness of guilt. He contends the instruction was unsupported by the evidence and thus rendered his trial fundamentally unfair under the federal and state constitutions. We disagree. There was ample evidence to support the instruction.

Using CALCRIM No. 372, the trial court instructed the jury:

"If the defendant fled or tried to flee immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence the defendant fled or tried to flee cannot by itself prove guilt."

This instruction was consistent with the directive in section 1127c, which states in relevant part:

"In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows:

19

"The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

A trial court is statutorily obligated under section 1127c to instruct a jury on flight when flight evidence is relied upon by the prosecution. (*People v. Howard* (2008) 42 Cal.4th 1000, 1020 (*Howard*).) " 'In general, a flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." [Citations.] " '[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested.' " ' " (*People v. Cage* (2015) 62 Cal.4th 256, 285; accord, *People v. Bradford* (1997) 14 Cal.4th 1005, 1055 (*Bradford*).)

"To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence." (*People v. Bonilla* (2007) 41 Cal.4th 313, 328; see also *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102 [all that is required is "some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference"].)

On appeal, we determine whether there is substantial evidence in the record to support the giving of a flight instruction. (See *People v. Pensinger* (1991) 52 Cal.3d 1210, 1245 ["Obviously a flight instruction is correctly given

'where there is substantial evidence of flight by the defendant . . . from which the jury could reasonably infer a consciousness of guilt' "].) In this context, "substantial evidence means evidence which is sufficient to deserve consideration by the jury and from which a jury composed of reasonable persons could conclude the particular facts underlying the instruction existed." (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 78.)

Substantial evidence supported the trial court's flight instruction here. The prosecution introduced evidence from which a juror could reasonably find that about 20 to 25 minutes after police arrived on the scene in response to the women's report of rape, and shortly after S.D. texted Coffer that he had raped her, Coffer climbed out the back window of 420 Elsie, jumped a fence onto an adjoining property and came out that property's driveway, where police happened to be waiting. Notably, although he had met C.D. and S.D. on the front porch of 420 Elsie, he did not exit from the front of that house. The surreptitious circumstances of appellant's departure suggested he had " ' "a purpose to avoid being observed or arrested." ' " (*Bradford*, *supra*, 14 Cal.4th at p. 1055.) The prosecutor relied on the evidence of Coffer's flight in closing argument. Therefore, the court was required to give the flight instruction under section 1127c.

Coffer argues that insufficient evidence supported the instruction because "[t]here was no pursuit by police from the crime scene or other evidence of flight. Instead, [Coffer] stayed in the house for about thirty minutes after the police arrived and surrounded the house. He was inside an abandoned house, and not at his residence. When he exited from the rear of the house, he did not run, but immediately complied with the officers' commands and was arrested without incident." He also notes that officers

21

saw he was inside the house, knew he lived in another house on the same street and had access to GPS information tracking his location and movements.

While Coffer was entitled to argue these facts in his defense, they do not change the fact that there was substantial other evidence from which a juror could reasonably conclude that he tried to sneak away and avoid police by climbing out a window at the back of the house, jumping over a fence and walking through a neighbor's property. Nothing more was required for the instruction to be given. (See *Bradford, supra*, 14 Cal.4th at p. 1055; *People v. Bonilla, supra*, 41 Cal.4th at p. 328; *People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 102.)

Further, Coffer's arguments are not supported by the record. He fails to show that police knew his identity, knew where he lived or knew he wore a GPS monitor before they arrested him. Nor does he explain why their knowledge that he was inside 420 Elsie shows he did not flee. That he remained inside for about 20 to 25 minutes after the police arrived does not disprove that when he did leave, he did so in a surreptitious way. (See *Howard, supra*, 42 Cal.4th at p. 1021 [flight instruction proper where defendant "remained at home for two days after [the victim] disappeared" until the victim's "body was discovered in the vacant garage across the wall from his room"]; *People v. Carter* (2005) 36 Cal.4th 1114, 1182 [flight instruction warranted by the evidence even though defendant left California "in the days immediately following the charged offenses"].)

22

Coffer analogizes his case to *People v. Crandell* (1988) 46 Cal.3d 833 (*Crandell*)[2]; *People v. Green* (1980) 27 Cal.3d 1 (*Green*)[3]; and *People v. Watson* (1977) 75 Cal.App.3d 384 (*Watson*).  These cases are easily distinguishable.

In *Crandell*, the California Supreme Court held the trial court erred in instructing the jury on flight because the defendant "left to accomplish specific tasks and with the intent of returning to dispose of the bodies," not "to avoid being observed or arrested."  (*Crandell, supra,* 46 Cal.3d at pp. 869-870.)  There is no analogous evidence here.

In *Green*, the California Supreme Court disagreed with the People that there was evidence of flight where the defendant "remained in his home surroundings for some two weeks after the crime"[;] "did not go into hiding, but continued to visit his friends as before"; and "contacted the police and volunteered statements about his wife's movements on the day of the murder."  (*Green, supra,* 27 Cal.3d at pp. 36-37.)  Again, there is no analogous evidence here.

In *Watson*, the appellate court held that the trial court erred in giving a flight instruction because "the mere fact of defendant's arrest nearly two days [after the crime] and miles away from the crime scene—standing alone— [was] not evidence of flight that may support an inference of guilt."  (*Watson, supra,* 75 Cal.App.3d at p. 403.)  Those circumstances are a far cry from Coffer's climbing out a window at the back of 420 Elsie, scaling a fence and

---

[2]  Disapproved on another ground in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365.

[3]  Disapproved on other grounds in *People v. Aledamat* (2019) 8 Cal.5th 1, 13 and *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3, and overruled on another ground in *People v. Martinez* (1999) 20 Cal.4th 225, 239.

crossing through a neighbor's yard within 20 to 25 minutes after the police arrived and shortly after receiving S.D.'s text accusing him of rape.

Coffer's argument that the trial court's flight instruction rendered his trial fundamentally unfair under the federal and state constitutions is meritless for the same reason as his claim of instructional error:  there was substantial evidence to support the instruction.

## III.

### *Coffer's Prior Prison Term Enhancement Sentence Must Be Stricken.*

At the sentencing hearing, the trial court struck one enhancement and imposed a one-year sentence for another one, based on Coffer having served a prior prison term, under section 667.5, subdivision (b).  Effective January 1 2020, Senate Bill No. 136 (2019-2020 Reg. Sess.) amended section 667.5, subdivision (b) to narrow the category of cases in which the enhancement applies.  (Stats. 2019, ch. 590, § 1.)  Coffer argues this newly amended section 667.5, subdivision (b) applies to him retroactively under *In re Estrada* (1965) 63 Cal.2d 740, and requires that we strike the enhancement.  The People agree.  The parties are correct.

Section 667.5, subdivision (b) as recently amended applies to Coffer's case because it ameliorates punishment and Coffer's conviction is not final. (*People v. Winn* (2020) 44 Cal.App.5th 859, 872-873 [amended section 667.5, subdivision (b) applies to nonfinal judgments on appeal]; *People v. Lopez* (2019) 42 Cal.App.5th 337, 340-342 [same]; see *In re Estrada, supra,* 63 Cal.2d at pp. 744-746 [absent evidence to the contrary, the Legislature intended amendments to statutes that reduce the punishment for a particular crime to apply to all defendants whose judgments are not yet final on the amendments' operative date].)

24

Enhancements under amended section 667.5, subdivision (b) are limited to individuals who have served a prior sentence for a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b).  (§ 667.5, subd. (b).)  The trial court found Coffer served two prior prison terms (it is not clear from the hearing transcript which one the court relied on in imposing sentence), one for sexual battery (§ 243.4, subd. (a)) and one for violating a sex offender registration requirement (§ 290.018, subd. (b).)  Neither is among the sexually violent offenses listed in Welfare & Institutions Code section 6600, subd. (b).  Thus, under section 667.5, subdivision (b) as amended and applied retroactively, the trial court erred in imposing the one-year enhancement sentence on Coffer.  We therefore strike the enhancement.

Our Supreme Court has held that "when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' " (*People v. Buycks* (2018) 5 Cal.5th 857, 893, quoting *People v. Navarro* (2007) 40 Cal.4th 668, 681), unless the trial court has already imposed the maximum sentence possible.  (*Buycks*, at p. 896, fn. 15.)  Here, the People point out that the trial court did not impose the maximum sentence possible because, for example, it sentenced Coffer on his robbery conviction to one year in prison to run concurrently to the consecutive terms it imposed for the sex offenses and the prior prison term enhancement.  Therefore, remand for a full resentencing is appropriate.

**DISPOSITION**

The judgment is affirmed, except that the court's imposition of a one-year sentence under section 667.5, subdivision (b) is stricken. We remand this matter to the trial court for the sole purpose of resentencing Coffer in light of our striking of that sentence.

_____
STEWART, J.

We concur.

_____
RICHMAN, Acting P.J.

_____
MAYFIELD, J.[*]

*People v. Coffer* (A158563)

_____

[*] Judge of the Mendocino Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27